**Morton A. BENDER et al., Appellants,**

v.

**The DESIGN STORE CORPORATION, Appellee.**

No. 13734.

District of Columbia Court of Appeals.

Argued April 6, 1979.

Decided July 23, 1979.

Arthur R. Goldberg, Chevy Chase, Md., with whom Leonard C. Greenebaum, Chevy Chase, Md., was on the brief, for appellants.

Burton A. Schwalb, Washington, D. C., with whom Allen V. Farber, Washington, D. C., was on the brief, for appellee.

Before KELLY, KERN and GALLAGHER, Associate Judges.

KELLY, Associate Judge:

Appellants sought in the trial court to enforce appellee The Design Store's alleged promise to lease certain commercial space from them, a promise on which they claimed they relied to their detriment. Summary judgment was granted in favor of appellee. Appellants challenge the trial court's judgment as erroneous because (1) there are questions of fact as to the existence of an explicit promise to lease, (2) appellee's actions constituted an implied promise to lease, (3) appellants' part performance and reliance created an estoppel against appellee, and (4) there are questions of fact as to appellants' alleged damages. We affirm.

Appellants are general partners in Northwestern Development Company B (Northwestern). In late 1972, Northwestern be-

gan design and construction of an office building in the District of Columbia. In early 1973, Northwestern began negotiations with The Design Store regarding the latter's leasing space in the building. Agents for both parties continued active communication through early 1976, at which time The Design Store notified Northwestern that because of financial difficulties it would be unable to lease the space.

Key among the communications were two early letters. On May 5, 1973, Stephen Newman, president of The Design Store, notified Northwestern, through the leasing agent, that he was interested in leasing space in the building. In the letter he stated:

> You realize this letter does not constitute an offer to lease, but should you be interested in pursuing this further I would be most willing to get together with you for serious negotiations to work this out in suitable detail.

On July 23, 1974, Newman again notified Northwestern of his interest. This time he included some proposed specifications for the lease, including 13 structural changes in the building. Once again, he stated:

> You understand that this letter is for discussion purposes only and that any commitment on our part to enter into a lease shall occur only upon our execution of a formal lease agreement. You have my personal assurance, however, of our full and expedited co-operation in working towards finalizing such an agreement.

Negotiations then continued for over a year. A number of the terms of the proposed lease were negotiated, and on August 14, 1975, the parties met in an attempt to agree on a final lease. A lease dated August 28, 1975, resulted from that meeting. This lease was executed by The Design Store and delivered to Northwestern for signature. Northwestern refused to sign, however, citing several infirmities in the proposed lease. In October 1975, The Design Store withdrew the August lease offer. It thereafter made a new lease offer, which also was not accepted by Northwestern.

During the continuing negotiations, a major source of discussion was the physical configuration of the building. The Design Store had requested, and Northwestern had made, numerous changes in the building's structure, including adding walls, installing new stairways, and relocating the mezzanine. In all, Northwestern made some $167,049.55 worth of architectural changes over a period of almost 1½ years. During this time, agents of The Design Store, requested changes, reviewed architectural plans, and directed work at the site.

In February 1976, The Design Store informed Northwestern that it could no longer afford to lease the premises. Some three months later Northwestern entered into a lease with another tenant. The Design Store averred in its motion that the revenue expected from Northwestern's ten-year lease with the new tenant exceeded its expected revenue from any proposed lease with The Design Store. Northwestern alleged that it could have received a greater rental from its new tenant had it not made the changes requested by The Design Store.

The Benders (Northwestern) brought this suit for damages incurred in reliance on The Design Store's promise to lease the premises, alleging that there was either an explicit or an implied contract to lease the premises in question, or that the conduct of The Design Store's agents was such as to induce them to reasonably and detrimentally rely on a promise to lease. The Design Store moved for summary judgment; the Benders effectively opposed only so much of the motion as pertained to their third alternative grounds for recovery. The trial court granted the motion for summary judgment, and this appeal followed.

Appellants' argument on appeal is grounded on the doctrine of promissory estoppel, a doctrine that is clearly recognized in this jurisdiction. *E. g., D. C. Area Community Council, Inc. v. Jackson,* D.C.App., 385 A.2d 185, 188 n. 1 (1978); *Tauber v. Jacobson,* D.C.App., 293 A.2d 861, 867 (1972); *Solway Decorating Co. v. Merando, Inc.,* D.C.App., 240 A.2d 361, 362 (1968); *N. Litterio & Co. v. Glassman Construction*

Co., 115 U.S.App.D.C. 335, 338, 319 F.2d 736, 739 (1963); *accord, Granfield v. Catholic University of America,* 174. U.S.App.D.C. 183, 188, 530 F.2d 1035, 1040, *cert. denied,* 429 U.S. 821, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976). Our holdings have been, generally, that "[t]o hold a party liable under the doctrine of promissory estoppel 'there must be a promise which reasonably leads the promisee to rely on it to his detriment, with injustice otherwise not being avoidable.'" *Solway Decorating Co. v. Merando, Inc., supra* at 362, quoting *N. Litterio & Co. v. Glassman Construction Co., supra,* 115 U.S. App.D.C. at 338, 319 F.2d at 739. This rule is derived from Restatement of Contracts § 90 (1932).[1]

From that general statement of the law there flows a series of questions, all of which must be answered in the affirmative in order to support the application of the doctrine of promissory estoppel. First, was there a promise? Second, should the promisor have expected the promisee to rely on the promise? And did the promisee so rely to his detriment? Finally would injustice result from a failure to enforce the promise? *E. g., Granfield v. Catholic University of America, supra,* 174 U.S.App.D.C. at 188, 530 F.2d at 1040.

Here we need go no further than the first question, for there is in this record no evidence of a promise to appellants from appellee to enter into a lease of the premises. *See, e. g., Sullivan v. Heritage Foundation,* D.C.App., 399 A.2d 856, 859 (1979). Notwithstanding appellants' argument to the contrary, appellee's direct statements that there existed no binding lease were sufficient to negate any inference that they had made such a promise. Through two letters sent in the early stages of negotiations,[2] appellee's agents made it clear that absent execution of a formal lease agreement, they intended no binding commitment to lease. Two lease agreements were sent to appellants by appellee and both were rejected.[3] Indeed, appellants' trial counsel acknowledged that appellee never made any explicit promise to lease.[4]

■ Appellants' argument that a promise to lease can be inferred from appellee's conduct is unpersuasive. We agree that, for purposes of estoppel, a promise need not be as specific and definite as a contract, *e. g., Hoffman v. Red Owl Stores, Inc.,* 26 Wis.2d 683, 690–91, 133 N.W.2d 267, 274–75 (1965), but in the final analysis there must be a promise. Courts and commentators alike agree that the detrimental reliance factor of promissory estoppel functions to replace one or more of the formal requirements of a contract, usually consideration. *E. g., Drennan v. Star Paving Co.,* 51 Cal.2d 409, 412, 333 P.2d 757, 760 (1958) (en banc); S. Williston, Contracts § 139 (rev. ed. S. Williston & G. Thompson 1936 & 1956 Cum. Supp.) (citing cases); 28 Am.Jur. *Estoppel and Waiver* § 48, at 657–58 (1966 & 1977 Cum.Supp.) (citing cases). But to enforce a lease on appellee would, consistent with the above analysis, be akin to forcing payment on an unwilling seller and then expecting that seller to tender delivery of goods.

---

1. Restatement of Contracts § 90 (1932) provides:

   A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

   The tentative draft of Restatement (Second) of Contracts provides:

   A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The

   remedy granted for breach may be limited as justice requires. [Tent. Draft No. 2.]

2. Those letters were dated May 5, 1973 and July 23, 1974.

3. Appellee executed a lease agreement in August 1975. It sent an unexecuted agreement to appellants in October 1975. Both agreements were rejected by appellants.

4. At an October 14, 1977 hearing, appellants' counsel stated:

   You get into a problem because they obviously didn't say we promise to do anything explicitly.

There simply was no promise here, either real or implied. *See School District Number 69 v. Altherr,* 10 Ariz.App. 333, 340, 458 P.2d 537, 544 (1969). Indeed, there is uncontradicted evidence that appellee explicitly refused to make such a promise to lease. All that was promised was that appellee would bargain in good faith, *cf. Silberman v. Roethe,* 64 Wis.2d 131, 138, 218 N.W.2d 723, 730 (1974) (lack of good faith bargaining negates argument that promise was only to negotiate), and such good faith negotiation occurred.[5]

We uphold the ruling of the trial court as to the application of promissory estoppel; accordingly, we need not consider appellants' remaining assignments of error.

*Affirmed.*

---

5. The following colloquy between the court and appellants' trial counsel took place at the October 14, 1977 hearing:

   THE COURT: Are you saying they didn't negotiate in good faith?

   [APPELLANTS' COUNSEL]: No, that is not our contention. It has never been our contention. In fact, our case is bolstered by the fact that they negotiated in good faith . . . .

