**HOWARD UNIVERSITY, Appellant,**

v.

**GOOD FOOD SERVICES, INC., Appellee.**

**No. 91–CV–196.**

District of Columbia Court of Appeals.

Argued Jan. 21, 1992.

Decided April 28, 1992.

Leroy Nesbitt, Jr., Washington, D.C., for appellant.

Ronald D. Guziak, Washington, D.C., for appellee.

Before ROGERS, Chief Judge, and FERREN and STEADMAN, Associate Judges.

FERREN, Associate Judge:

In a third party complaint, appellant Howard University alleged that appellee Good Food Services (GFS) owed the University indemnification for any liability arising out of a suit against the University for personal injuries filed by a GFS employee who was injured while working as a cook in a University kitchen operated by GFS. The University also alleged that GFS violated its contract with the University by failing to name the University as an additional insured on GFS's insurance policy covering its restaurant operation at the University. The trial court granted GFS's motion for summary judgment on both claims. The University appeals both rulings and also argues on appeal that the trial court abused its discretion by denying the University's motion for leave to amend its third party complaint to add a claim of promissory estoppel. We conclude that the trial court did not abuse its discretion in denying the University's motion to amend, and we affirm the order granting summary judgment on the University's indemnification claim. But we reverse the order granting summary judgment on the contract claim and remand the case for further findings on the preliminary factual question whether the parties' written agreement was completely integrated.

I.

On July 1, 1983, GFS and the University signed a written agreement under which GFS contracted to operate the University's food service facilities and provide meals for students and others authorized to use the University's food services. The agreement makes clear that the University retained ownership of, and ultimate control over and responsibility for, the kitchen facilities and

equipment, whereas GFS had day-to-day responsibilities such as keeping the kitchen facilities clean, supervising GFS employees in the kitchens, and implementing University food service policies. The agreement required GFS to submit to the University an insurance certificate indicating that GFS had purchased various types of insurance, including worker's compensation and liability coverage, "in such amounts that are acceptable to the University."

In the 1970s the University began requesting that its food service contractors name the University as an additional insured on their liability insurance policies. In August 1983, the University began an annual practice of making this request in writing. Although that requirement was not a term of the parties' 1983 written agreement, copies of insurance certificates from 1983 until February 1986 show that GFS complied with the University's requests. From February 1986 until November 1988, however, GFS did not comply with those requests; GFS's insurance certificates for that period do not list the University as an additional insured, and the University apparently did not confront GFS about this omission.

On June 26, 1987, the University and GFS entered into a second written agreement substantially identical to their 1983 agreement. The 1987 agreement contained the same insurance provision as the 1983 agreement, and, like that agreement, the 1987 agreement did not include a provision requiring GFS to carry the University as an additional insured.

On June 20, 1988, Ida Tyler, a GFS employee who worked as a cook, was injured in one of the University's kitchens; hot water from a defective steam kettle spilled on her legs after she had bumped into it with a cart. Mrs. Tyler had known that the kettle was defective before she started using it that day, but she had used it anyway because no other kettle was clean at the time. It appears that University officials as well as the president and employees of GFS had been aware of the defective kettle since November 1987, when a Howard University plumber with responsibility for inspecting the kitchen had discovered that the tilt control lever of the kettle was broken. The University had not been able to obtain the necessary parts to repair the kettle and had not removed the kettle from the kitchen by the time of Mrs. Tyler's accident.[1]

As a result of her on-the-job accident, Mrs. Tyler filed a worker's compensation claim against GFS, whose insurance carrier paid the claim. On September 30, 1988, Mrs. Tyler filed a lawsuit against the University, alleging that her injuries were caused by the University's negligence, including its "failure to inspect and maintain the cafeteria's food preparation equipment, failure to warn, and failure to provide a safe working place for the plaintiff." On October 26, 1989, the University filed a third party complaint against GFS alleging negligence and breach of contract and seeking indemnification for any damages the University had to pay Mrs. Tyler. At a January 5, 1990 scheduling conference, the trial court set a discovery deadline of May 1, 1990, a motions deadline of May 22, 1990, and a pretrial conference for June 19, 1990. As of the time of the scheduling conference, the parties had conducted discovery only to the extent of producing documents and answering interrogatories. On May 8, 1990, the University moved for leave to conduct more than five nonparty depositions. The court granted the motion on May 14.

On May 16, 1990, after the close of discovery but before the motions deadline, the University filed a motion for leave to amend its third party complaint to add a promissory estoppel claim that GFS was liable to the University for any damages the University had to pay Mrs. Tyler because the University had relied to its detriment on GFS's promise to name the University as an additional insured on its liability policy. The trial court denied that mo-

---

1. Even though the parties agree that the University had responsibility as owner of the kettle to repair it, there is a factual dispute as to who was at fault for not putting the kettle out of commission.

tion on June 4, 1990. On May 11, 1990, GFS moved for summary judgment on the University's indemnity and contract claims. The court granted the motion on both claims on January 16, 1991. Meanwhile, on September 13, 1990, the plaintiff's case was called for jury trial. After plaintiff Tyler completed her case-in-chief on September 17, the trial court denied the University's motion for directed verdict. The University completed its defense case on September 18 and renewed its motion for directed verdict, which the court reserved; the court then denied the plaintiff's motion for directed verdict, and the parties made their closing arguments. Before the jury returned its verdict, however, the University settled its case with Mrs. Tyler, and the court dismissed the case with prejudice. The University then filed a timely appeal of the trial court's order of June 4, 1990 denying the University's motion for leave to amend its third party complaint against GFS, and of the court's order of January 16, 1991 granting summary judgment for GFS.

## II.

◼ The University argues that the trial court abused its discretion by denying the University's motion to amend its third party complaint to add a promissory estoppel claim based on the University's reliance on GFS's promise to name the University as an additional insured. The grant or denial of a motion to amend is committed to trial court discretion, *e.g., Plummer v. Johnson*, 35 A.2d 647, 648 (D.C.1944), and this court's role is to "examine[ ] the record and the trial court's determination for those indicia of rationality and fairness that will assure it that the trial court's action was proper." *Johnson v. United States*, 398 A.2d 354, 362 (D.C.1979). Undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previous amendments, and undue prejudice to the opposing party are all valid grounds for refusing to allow amendment. *E.g., Eagle Wine & Liquor Co. v. Silverberg Elec. Co.*, 402 A.2d 31, 34–35 (D.C.1979); *Gordon v. Raven Systems & Research, Inc.*, 462 A.2d 10, 13 (D.C.1983); *see also Foman v.* *Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

◼ The exercise of the trial court's discretion on a motion to amend a pleading, however, must be informed by Super.Ct.Civ.Proc.R. 15(a) which provides: "[A] party may amend the party's pleading only by leave of court ...; and leave shall be freely given when justice so requires." Accordingly, "[t]he discretion accorded the trial court in deciding a motion for leave to amend is to be considered together with the prevailing spirit of liberalism in allowing such amendments when justice will be so served." *Eagle Wine & Liquor Co.*, 402 A.2d at 34. Although the decision is a matter of trial court discretion, there is a "virtual presumption" a court should grant leave to amend unless there is a good reason to the contrary. *Bennett v. Fun & Fitness of Silver Hill*, 434 A.2d 476, 478 (D.C.1981) (citing cases). Thus, even lengthy delay, standing alone, is usually not a sufficient reason for the trial court to deny a motion to amend. *Eagle Wine*, 402 A.2d at 35.

◼ The trial court denied the University's motion after finding that the University had all the necessary facts to state a promissory estoppel claim at the time it filed its third party complaint. In particular, the court noted a November 1988 letter the University had sent to the president of GFS, John Goodwin, in which the University demanded indemnification from GFS after Mrs. Tyler's accident and asserted that GFS had "historically include[d] Howard as an additional insured in its general liability insurance policy." Based on that finding, the court concluded that, in light of the fact that the case was already a year and a half old, there was no justifiable reason to risk further delay, including time for additional discovery, to the prejudice of GFS. The University countered at the time, and argues on appeal, that it could not have alleged facts sufficient to satisfy the reliance element of a promissory estoppel claim until after it had received information from the April 1990 depositions of two witnesses, John Goodwin and Alexander Chalmers (the University official in charge of admin-

istering the GFS contract until his retirement in 1989). After reviewing these depositions, we agree with the trial court, as elaborated below, that they did not add anything significant to the University's claim of promissory estoppel, which had been available in October 1989 when the University had filed its complaint against GFS.

In general, to "hold a party liable under the doctrine of promissory estoppel there must be a promise which reasonably leads the promisee to rely on it to his [or her] detriment, with injustice otherwise not being avoidable." *Bender v. Design Store Corp.*, 404 A.2d 194, 196 (D.C.1979) (quotations and cites omitted); *accord Moss v. Stockard*, 580 A.2d 1011, 1034 (D.C.1990). Under the RESTATEMENT OF CONTRACTS (SECOND) § 90(1) (1979),

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.

Thus, to make out a claim of promissory estoppel, the following questions must be answered in the affirmative: "First, was there a promise? Second, should the promisor have expected the promisee to rely on the promise? [Third,] did the promisee so rely to his [or her] detriment?" *Bender*, 404 A.2d at 196.

■ At the time the University filed its third party complaint, its own records showed that since 1983 it had requested GFS to name the University as an additional insured and that GFS had honored that request until February 1986. Furthermore, the University alleged in that complaint that it might ultimately have to pay damages to Mrs. Tyler because GFS had broken its promise to name the University as an additional insured. These allegations form the basis of the University's original breach of contract claim and appear to be a sufficient basis for alleging in good faith that there were a promise and detrimental reliance and that the nature of the promise was such that GFS should have expected the University to rely on it. *See Bender*, 404 A.2d at 196.[2] Furthermore, a review of the April 1990 depositions shows that the statements of deponents Goodwin and Chalmers merely confirm, and add details to, information the University already had that was sufficient for a promissory estoppel claim when it filed its complaint a year and a half before it filed its motion to amend.

The trial court found that the University's amended third party complaint would require additional discovery for both sides and would delay the pretrial conference—scheduled for just a month after the University filed its motion to amend—and ultimately the trial. The court concluded that disruption of the previously agreed upon schedule would be undue delay, given that the University had the necessary facts to claim promissory estoppel well before the court set its schedule in January 1990, four and a half months before the University's motion to amend. *See Gordon*, 462 A.2d at 13 (when exercising discretion in ruling on motion to amend, trial court may consider effect on "orderly administration of justice"). The court also found that, by adding a new theory of liability, the University's proposed amendment necessarily would have prejudiced GFS by causing additional discovery time—and the expense that entails—and could have resulted in a fourth party complaint against GFS's liability insurance carrier (with further discovery time and expense since the carrier had not been deposed). While calling this finding "speculative," the University does not attempt to refute it.

This is not a case where trial had begun before the motion to amend, *see Plummer*, 35 A.2d at 648; *Dietz v. Miles Holding Corp.*, 277 A.2d 108, 111 (D.C.1971), or

---

**2.** We offer no opinion as to whether the University could withstand a motion for summary judgment on its promissory estoppel claim. We do note, however, that the merit of an amended pleading is also a factor the trial court may consider in ruling on a motion to amend. *See Bennett*, 434 A.2d at 478–79 (citing *Randolph v. Franklin Investment Co.*, 398 A.2d 340, 350 (D.C. 1979) (en banc)).

where there was evidence of "bad faith or dilatory motive." *Eagle Wine*, 402 A.2d at 34; *see Order of Ahepa v. Travel Consultants, Inc.*, 367 A.2d 119, 123–24 (D.C.1976) (trial court denied fourth motion to amend after first three requests to amend had been granted), *cert. dismissed*, 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977). But such circumstances or findings provide merely a sufficient and not a necessary basis to deny a motion to amend. As we stated in *Eagle Wine*:

> [E]ven in the absence of an outright showing of bad faith, the lateness of a motion may well provide the predicate for a proper determination that prejudice to the opposing party would result if an amendment were allowed. Such a determination may rest on findings that the moving party has not put forth any satisfactory reason for the delay (*e.g.*, new information which could not have been uncovered earlier) and that an "unduly delayed" amendment would mean a large additional expenditure of effort and money by the opposing party in discovery on a new aspect of the case after substantial discovery already has taken place.

402 A.2d at 35; *see Gordon*, 462 A.2d at 13.

Because the University failed to "put forth any satisfactory reason for the delay" in amending its complaint, *Eagle Wine*, 402 A.2d at 35, and because of the potential prejudice to GFS of additional delay and expense, as found by the trial court, we conclude—especially in light of the University's failure to refute the findings of potential prejudice—that the trial court did not abuse its discretion in denying the University's motion to amend. The trial court "exercis[ed] its judgment in a rational and informed manner," and its "action was within the range of permissible alternatives." *Johnson*, 398 A.2d at 365.

### III.

A trial court may properly grant summary judgment when the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Nader v. de Toledano*, 408 A.2d 31, 41 (D.C.1979),

*cert. denied*, 444 U.S. 1078, 100 S.Ct. 1028, 62 L.Ed.2d 761 (1980); *accord* Super.Ct.Civ.R. 56(c). Our role in reviewing a summary judgment order is to apply that same standard. We must therefore undertake a de novo examination of the record and view all facts in the light most favorable to the nonmoving party. *E.g., Thompson v. Shoe World, Inc.*, 569 A.2d 187, 189 (D.C.1990). If the evidence of record and reasonable inferences based on that evidence would permit a factfinder to favor the nonmoving party, summary judgment is inappropriate. *E.g., Nader*, 408 A.2d at 42. We first examine the trial court's order granting summary judgment for GFS on the University's indemnity claim and then turn to the contract claim.

### A.

 The trial court concluded that, as a matter of law, the University had no claim for implied contractual indemnity against GFS because the only duty GFS had with respect to the defective kettle was the duty it owed to the plaintiff-employee, and because under the contract the University maintained custody and control of the kettle and was responsible for repairing all equipment defects. Because we find evidence in the record supporting the University's allegations that GFS owed the University an independent contractual duty with respect to the kettle, we cannot affirm on those grounds. For other reasons set forth below, however, we conclude that, as a matter of law, GFS was entitled to summary judgment on the University's indemnification claim.

 Indemnity is a common law remedy that arises from an express or implied contract giving the right of complete reimbursement to one party who has been compelled by law to pay what the other party should pay. *See* S. SPEISER, C. KRAUSE & A. GANS, 1 THE AMERICAN LAW OF TORTS § 3:26, at 479 (1983); RESTATEMENT (SECOND) OF TORTS § 886B. An obligation to indemnify exists where the equities of the case and the relationship of the parties support shifting responsibility from one party to another. *See Nat'l Health Labs., Inc. v.*

*Ahmadi,* 596 A.2d 555, 557–58 (D.C.1991); *George's Radio Inc., v. Capital Transit Co.,* 75 U.S.App.D.C. 187, 190, 126 F.2d 219, 222 (1942); PROSSER & KEETON ON THE LAW OF TORTS § 51, at 344 (5th ed. 1984). Common examples include: a car owner, liable to a third party for injuries caused by his or her car, who seeks indemnification against the driver of the car who negligently caused the third party's injuries; an employer, liable to a third party for injuries caused by his or her employee, who seeks indemnification against the employee whose negligence caused the harm. *See Nat'l Health Labs.,* 596 A.2d at 557–58 (citing PROSSER & KEETON ON THE LAW OF TORTS § 51, at 341–42). In the absence of an express contractual duty to indemnify, a right to indemnity exists where a duty to indemnify may be implied out of a relationship between the parties to prevent a result which is unjust. *East Penn Mfg. Co. v. Pineda,* 578 A.2d 1113, 1126 (D.C.1990); *accord Nat'l Health Labs.,* 596 A.2d at 558.

The specific issue in this case is whether an employer—who has already paid worker's compensation to an employee for an on-the-job accident—can be held liable to indemnify a third party who has been sued by the same employee for the same accident. The Workers' Compensation Act, D.C.Code §§ 36–301—36–345 (1988 & 1991 Supp.) (WCA), gives employees an efficient, no-fault means of recovery for work-related injuries and, in exchange, grants employers immunity from employee lawsuits for damages arising from workplace accidents. *See generally Grillo v. Nat'l Bank of Washington,* 540 A.2d 743, 748 (D.C. 1988). The exclusivity provision of the WCA states:

> The liability of an employer [covered under the Act] shall be exclusive and in place of all liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law on account of [the employee's] injury or death.

D.C.Code § 36–304(a).

Nothing in the statute prevents an employee (who is eligible for or has already collected worker's compensation) from filing a claim against a third party who may be liable in tort for the employee's work-related injury. *See Myco Inc. v. Super Concrete Co.,* 565 A.2d 293, 296–97 (D.C. 1989); *Wentworth Hotel, Inc. v. F.A. Gray, Inc.,* 110 N.H. 458, 272 A.2d 583, 584–85 (1970). If the third party seeks recovery from the employer, however, such an action may not be premised on the theory of contribution from a joint tortfeasor, because, under the exclusivity provision of the WCA, an employer cannot be held liable in tort for the injury to the employee. *Myco,* 565 A.2d at 298–99 (citing 2B A. LARSON, WORKMEN'S COMPENSATION LAW § 76.20, at 14–654 & n. 24 (1989)).

In *Myco, supra,* this court examined the effect of the WCA exclusivity provision on a defendant's attempt to recover from a plaintiff-employee's employer on a theory of implied indemnity.[3] After analyzing cases and other authorities, as well as various common law theories of indemnity, 565 A.2d at 295–300,[4] we concluded that a third party who has been sued by an employee may pursue a claim against the employer—who has already settled with the employee under worker's compensation—for implied indemnity, when the indemnity claim rests on an independent duty the employer owes to the third party arising out of a "special relationship" between them, but not a relationship arising merely "on account of" the

---

**3.** "It is well settled in most jurisdictions that when the third party's claim against the employer is for indemnity pursuant to an express contractual provision, the exclusivity provisions of workers' compensation laws do not bar indemnification." *Myco,* 565 A.2d at 297. There is no express indemnification clause in the 1987 written agreement between the parties in this case, and the University does not argue that GFS's practice of naming the University as an additional insured on its insurance policy (the basis for the University's breach of contract claim, *see infra* part III–B) constitutes an express promise to indemnify.

**4.** For further discussion of various implied indemnity theories, see *East Penn Mfg. Co.,* 578 A.2d 1113 at 1127–28 n. 20.

124 ■

employee's accident. *Id.* at 299–300; *see also* S. SPEISER, C. KRAUSE & A. GANS, *supra*, § 3:36, at 513 & n. 51. In order not to offend the legislative policies and purposes underlying the WCA as expressed in its exclusivity provision, we adopted the following test: the obligation to indemnify "must arise out of a specific duty of defined nature—separate from the injury to the employee—owed to the third party by the employer." *Id.* at 299. If the third party can satisfy that test, then the third party's claim against the employer is more like one for "reimbursement" than for damages from the employee's accident. *Id.* (citing A. LARSON, *supra*, § 76.41, at 14–733 to –734).

In *Myco*, the plaintiff had sued the manufacturer of a power truck washer for the wrongful death of her husband, who had been electrocuted while using the washer in his employ with Super Concrete. Myco, the manufacturer, defended by arguing that Super Concrete owed it an implied duty to use Myco's product in such a way as to not expose Myco to liability. We rejected that implied duty argument, declaring that "imposition of such a duty would stand 'indemnity on its head.'" *Id.* at 300 (quoting *Santisteven v. Dow Chemical Co.*, 506 F.2d 1216, 1219 (9th Cir.1974)). Because Super Concrete only owed a duty of proper care and use of the washer to its employees, and not to Myco as the manufacturer of the washer, we concluded that there was no "special relationship" between Myco and Super Concrete obligating Super Concrete, the employer, to indemnify Myco, the manufacturer sued by the employee. *See id.* at 300.

In contrast with the factual situation in *Myco*, the University's indemnity claim does rest on independent duties GFS owed to the University and allegedly violated: the duties of GFS arising out of its contract with the University (1) to keep the kitchen (including the working kettles) clean, (2) to maintain at all times a food service director to supervise the work of GFS employees, and (3) to implement University policies regarding the kitchen and the use (and non-use) of kitchen equipment. We therefore disagree with the trial court's

conclusion that GFS owed no independent duty regarding proper care and use of the kettle to the University. Unlike the situation in *Myco*, which involved a one-time sale of equipment with follow-up service, the parties in this case had an ongoing and comprehensive contractual relationship involving day-to-day interaction and decision-making.

The fact that the University has based its indemnity claim on GFS's independent contractual duties, however, does not end the inquiry. In order to be entitled to indemnity, the University also had to show that GFS's breach of its contractual duties with respect to the use and care of the broken kettle was the basis of the plaintiff-employee's tort claim against the University. If GFS's breach of a duty it owed the University is not the alleged or actual cause of the plaintiff's injuries, then there is no reason to shift the University's liability to GFS under equitable principles of implied indemnity. *See Myco*, 565 A.2d at 298 ("[I]f one breaches a duty owed to another *and the breach causes injury*, the former should compensate the latter." (citing PROSSER & KEETON, *supra*, § 53, at 356–59) (emphasis added)).

A review of plaintiff Tyler's complaint shows that she alleged her injuries were caused by the University's own negligence as owner and keeper of the kettle and kitchen; *i.e.*, failure of the University to inspect and maintain the kettle, failure to warn of potential danger arising from the broken kettle, and failure to provide a safe working environment. The University does not dispute that it owned the kettle and had responsibility for repairing it. Furthermore, a reading of the contract between GFS and the University demonstrates that the University retained ultimate control over, and responsibility for, the kettle and the operation of the kitchen:

The University will provide GFS with all facilities for food service ... completely equipped and ready to operate.... GFS shall not remove any UNIVERSITY owned equipment from the premises without prior authorization.

\* \* \* \* \* \*

The following costs and provisions will remain the responsibility of the UNIVERSITY: ... Equipment repair and replacement, due to wear and tear.

\* \* \* \* \* \*

All general and specific policies connected in any way with the food service operations will be formulated by the UNIVERSITY and implemented by GFS.

Because the plaintiff alleged her injuries were caused by the University's negligence in performing its primary duties under the contract, the University was not alleged to be liable for harm caused by GFS, the third party defendant. *Cf. George A. Fuller Co. v. Otis Elevator Co.*, 245 U.S. 489, 38 S.Ct. 180, 62 L.Ed. 422 (1918) (general contractor liable for injury caused by subcontractor entitled to indemnification from subcontractor); *Washington Gaslight Co. v. District of Columbia*, 161 U.S. 316, 327, 16 S.Ct. 564, 568, 40 L.Ed. 712 (1896) (although District liable to plaintiff for injuries suffered when plaintiff fell into hole in street, District had remedy over against gaslight company responsible for creating dangerous nuisance); *East Penn Mfg. Co.*, 578 A.2d at 1127 (where retailer only secondarily liable for plaintiff's injuries in failing to discover defect, equitable to shift burden of loss to manufacturer who produced defective product); *General Elevator Co. v. District of Columbia*, 481 A.2d 116, 119 (D.C.1984) (where District only found liable for breach of duty it had delegated to appellant, indemnification under contract appropriate). In contrast with the above cases, the plaintiff here alleged that her injuries were caused by the failure of the University to perform duties it had assigned to itself under the contract with GFS.

The University might have saved its implied indemnity claim by arguing successfully at the plaintiff-employee's trial that her injuries were proximately caused by GFS for failing to perform duties assigned to it under the parties' contract (and thus the University was only secondarily or vicariously liable). The University, however, settled with employee Tyler in the midst of trial, thereby electing to discharge its liability as alleged in her complaint. Although, theoretically, the University could still have proved that GFS's negligence, rather than its own, had caused the employee's injuries, the employee's allegations set forth in her complaint asserted that the accident was directly caused not by GFS but by the University. That was the claim the University settled, not one in which allegedly the University was only secondarily liable for the primary acts of GFS.

■■■ The University therefore is not an indemnitee liable in an underlying suit "solely by imputation of law because of a relation to the actual wrongdoer." PROSSER & KEETON, *supra*, § 51, at 341. Rather, the University settled a lawsuit in which the plaintiff alleged that the University was the "actual wrongdoer." *Id.* Accordingly, we conclude, as a matter of law, that the University does not have a claim for implied indemnity. *Cf. Cartel Capital Corp. v. Fireco of New Jersey*, 81 N.J. 548, 410 A.2d 674, 683 (1980) (once jury found that defendant/third party plaintiff was negligent and that its negligence was contributing cause of plaintiff's injuries, third party plaintiff could not claim right to indemnification against third party defendant). We therefore affirm the order granting GFS's motion for summary judgment on the indemnity claim.[5]

### B.

■■■ The University argues, independently of its effort to amend its complaint to allege promissory estoppel, that GFS's actions from 1983 through February 1986 in naming the University as an additional insured on GFS's liability insurance policy constitutes an enforceable term of the par-

---

**5.** We note that even if summary judgment were not appropriate here, the general rule is that, in order for an indemnitee to prevail, the indemnitee must show by a preponderance of the evidence that he or she was actually liable to the person harmed or that the indemnitee submitted to the purported indemnitor for approval a proposed settlement with the plaintiff. *See* S. SPEISER, C. KRAUSE & A. GANS, *supra*, at § 3:26, at 482–83. The record does not show that either of these conditions was satisfied.

ties' contract. The trial court, however, after "considering the written contract, the conduct and language of the parties and the surrounding circumstances" concluded "that the written agreement is completely integrated" and thus granted GFS summary judgment.

The court's legal conclusions were based on the following facts: (1) the parties' 1987 agreement did not contain express language requiring GFS to name the University as an additional insured; (2) the 1987 agreement contains a provision requiring that any change, modification, or amendment be made in writing; and (3) there was no written modification, amendment, or change. Based on these facts, the trial court announced the following conclusions of law: (1) the fact that GFS carried the University as an additional insured for three years after the signing of the parties' 1983 contract (but before the 1987 contract) did not mean GFS was required under the 1987 contract to name the University as additional insured; [6] (2) the University's annual requests to GFS that it carry the University as an additional insured do not point to any legally enforceable promise; (3) the parties "reduced essentially their entire agreement to a writing which is unambiguous," and therefore the court could not consider parol or extrinsic evidence.

Because the trial court did not correctly apply the law applicable to contract integration and thus failed to take sufficiently into account the parties' conduct after their 1983 agreement but before their 1987 agreement, we conclude the court erred in granting GFS's motion for summary judgment. The factual record, however, is inconclusive as to whether the 1987 agreement was completely integrated with respect to insurance coverage, and thus we must remand for further findings. Whether the 1987 agreement was completely integrated depends on whether the parties in-

tended at the time they entered into the agreement to continue or resume the practice whereby GFS named the University as an additional insured.

We agree with the trial court that because the 1987 agreement does not contain a provision requiring GFS to name the University as an additional insured, the main issue on summary judgment was whether the 1987 agreement was an integrated agreement "adopted by the parties as a complete and exclusive statement of the terms of the agreement." *Ozerol v. Howard University,* 545 A.2d 638, 641 (D.C. 1988), *reh'g granted,* 555 A.2d 1033 (D.C. 1989) (remanding for trial court to review finding of complete integration in light of factual stipulation at trial overlooked by court); *accord* RESTATEMENT (SECOND) OF CONTRACTS § 210. If so, the agreement was "completely integrated" and no additional terms could be considered in interpreting the contract. *See* RESTATEMENT (SECOND) OF CONTRACTS § 210 at comment a. If, however, the parties did not intend for the 1987 agreement to be exclusive on all matters of their contractual relationship, the agreement was "partially integrated" and "consistent additional terms may be shown." *Id.*

The question whether an agreement is completely integrated is a preliminary question of fact for the trial court. *See Ozerol,* 545 A.2d at 641. The court's factual inquiry must focus on the intent of the parties at the time they entered into the agreement. "This intent must be sought where always intent must be sought, namely, in the *conduct* and *language* of the parties and the *surrounding circumstances.* The document alone will not suffice. What it was intended to cover cannot be known until we know what there was to cover." *Id.* (emphasis in original, quotations omitted); *see Stamenich v. Markovic,*

---

**6.** As elaborated above in Part I, the University's practice since the 1970s was to ask its food services contractor to name the University as an additional insured on the contractor's liability policy. From September 1983—shortly after the parties entered into their 1983 agreement—until February 1986 (and then beginning again in November 1988), GFS responded affirmative-ly to the request and presented the University with an insurance certificate indicating the University's additional insured status. Between February 1986 and June 1988, however, the University sent its annual letter making the request but did not follow up when the insurance certificates failed to list the University as an additional insured.

462 A.2d 452, 456 (D.C.1983). Evidence in addition to the written agreement admissible for determining whether the parties' contract is completely, or only partially, integrated includes "[a]greements or negotiations prior to or contemporaneous with the adoption of a writing." RESTATEMENT (SECOND) OF CONTRACTS § 214; *see id.* at § 210, illustration 1. The presence or absence of a merger clause indicating complete integration may be a significant, though not conclusive, factor in ascertaining the parties intent. *See* II FARNSWORTH ON CONTRACTS § 7.3, at 204–07 (1990).

 In considering such evidence and in determining the preliminary factual issue of whether the parties intended a writing to be integrated, the trial court does not apply the parol evidence rule.[7] *ld.* at § 214, comment a. That rule only comes into play after the court has decided that the writing is completely, rather than partially, integrated. *See Ozerol,* 545 A.2d at 641–42.[8]

Although we agree with the trial court that there is no evidence the University made an effort to amend or modify the 1987 written agreement, the court failed to recognize sufficiently that the parties' *prior* conduct—in particular the University's annual request to be named as an additional insured, GFS's corresponding compliance with that request until February 1986, and GFS's noncompliance thereafter and the University's failure to demand compliance—is relevant and must be considered in determining the intent of the parties when they entered into the 1987 agreement. Furthermore, the trial court failed to consider that the written agreement did not contain a merger clause. The parties' conduct after the 1983 written agreement may have been a valid and binding modification of the parties' contractual relationship or a collateral agreement, and it may have been their intention to continue that modification for as long as they were contracting. *See, e.g., Clark v. Clark,* 535 A.2d 872, 877 (D.C.1987) (oral modification of term in written agreement still binding even if subsequent negotiations to modify agreement in writing do not result in further modification of the orally modified term); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 4 (contractual promise may be oral, written, or inferred wholly or partly from conduct).[9]

There is some indication, for example, that GFS was aware of the University's historical practice—before the parties' first agreement in 1983—of requiring its food service providers to name the University as an additional insured. Furthermore, GFS's pattern of complying with the University's request to be named as an additional insured, the fact that the University continued both before and after the 1987 written agreement to ask GFS to name it as an additional insured (even though GFS had stopped complying with the annual request), and the fact that the language and provisions of the 1987 written agreement were almost identical to the 1983 written agreement under which GFS did comply

---

7. This court has emphasized that summary judgment is inappropriate when the intent of the parties to a contract is ambiguous. *See, e.g., International Bhd. of Painters and Allied Trades v. Hartford Accident & Indem. Co.,* 388 A.2d 36 (1978). Because the trial court misapplied the law of contract integration, it failed to consider the "parol evidence" of the parties' intent before ordering summary judgment.

8. Under the parol evidence rule, if an agreement is partially integrated (e.g., part written and part oral), the writing supercedes inconsistent terms of previous agreements. If an agreement is completely integrated, the writing supercedes all written or oral agreements within its scope. *See* RESTATEMENT (SECOND) OF CONTRACTS § 213. As Farnsworth points out, however, "even the finding of a completely integrated agreement does not preclude a showing of a 'collateral agreement,' as long as it does not contradict the main agreement." II FARNSWORTH ON CONTRACTS § 7.3, at 207.

9. An oral modification to a written contract may be binding even if the written agreement includes a provision, as in this case, expressly prohibiting oral modification. *Clark,* 535 A.2d at 876. We note that if the parties did modify their 1983 written agreement, then that modification is in part based on writings: the University's letters requesting to be named as additional insured and GFS's written response transmitting the conforming insurance certificates. *See* RESTATEMENT (SECOND) OF CONTRACTS § 210, comment c (writings which prove partial integration may be part of contractual agreement).

with the University's request, comprise evidence tending to show that the parties did not intend for the 1987 written agreement to be a completely integrated writing, at least with respect to insurance coverage.[10] Moreover, an antecedent agreement requiring GFS to name the University as an additional insured, if still in force at the time the parties entered into the 1987 agreement, would not necessarily be inconsistent with the provision in the 1987 agreement requiring GFS to carry various types of insurance coverage.[11]

The record, however, is not sufficient for us to resolve conclusively two factual questions critical to the issue of integration: (1) whether the parties intended the practice of GFS naming the University as additional insured to be a permanent part of their contractual relationship between 1983 and 1987; and (2) whether they intended for that practice to continue when they signed their 1987 agreement. *See Nader*, 408 A.2d at 42 (court's role in reviewing summary reversal is not to resolve factual issues). If the answer to either of those questions is "no," then the 1987 agreement was completely integrated with respect to insurance requirements. If the answer to both of those questions is "yes," however, then the 1987 agreement was not completely integrated, and the meaning and effect of the "additional insured" term or collateral agreement, in relation to the University's claim, must be determined. Presumably, the answers to the above questions will largely depend on facts, including the intent of the parties, surrounding the failure of GFS to honor the University's annual request to be carried as an additional insured from February 1986 until Mrs. Ty-

ler's accident, and on the University's failure to follow up when GFS did not comply.

Furthermore, if the trial court should find that the "additional insured" term is unambiguous (a proposition we could not sustain on the record before us), then it may interpret it as a matter of law. *See Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1092–93 (D.C.1988). If, however, the term is ambiguous, the factfinder at trial must interpret its meaning by judging the credibility of extrinsic evidence and by making reasonable inferences from such evidence. *Id.* at 1092.[12]

In sum, the trial court still must decide, as a preliminary matter, the factual question whether the contract is completely integrated. The answer will depend on the intent of the parties at the time they entered into the agreement, derived from the language of the agreement, the conduct of the parties, and all relevant surrounding circumstances. *See Stamenich*, 462 A.2d at 456. Such an inquiry necessarily will include an examination of extrinsic evidence that would have to be excluded at trial, as parol evidence, if the court were to find the contract was completely integrated. *See* RESTATEMENT (SECOND) OF CONTRACTS § 213. We leave it to the trial court to decide how best to proceed in answering the preliminary factual question of integration.

*Reversed and remanded.*

---

10. There is other evidence that the parties did not intend for the 1987 agreement to be completely integrated: the trial court found that the parties orally agreed to a payment schedule for GFS to reimburse the University for University employees "loaned" to GFS. The 1987 written agreement contains no such term.

11. The insurance provision states:
 GFS will furnish a certificate to the UNIVERSITY that it carries workman's compensation, comprehensive public liability, property damage and product liability insurance in such amounts that are acceptable to the UNIVERSITY. The cost of such insurance will be paid

by GFS. The UNIVERSITY will waive any and all rights of recovery from GFS for losses caused by perils defined in fire, extended coverage and sprinkler leakage insurance policies.
 An agreement requiring a rider on the above listed insurance would not be inconsistent with requiring GFS to carry those coverages.

12. It would also be up to the factfinder to determine whether the University would be entitled to indemnity under the "additional insured" term, if it exists.