**PIEDMONT RESOLUTION,
L.L.C., Plaintiff,**

v.

**JOHNSTON, RIVLIN & FOLEY,
et al., Defendants.**

**No. CA 96–1605(PJA).**

United States District Court,
District of Columbia.

March 13, 1998.

Eugene M. Propper, Washington, DC, for Plaintiff.

David Durbin, Pamela Bresnahan, Steven Becker, Paul J. Maloney, John T. May, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

ATTRIDGE, United States Magistrate Judge.

Pending before the Court are several motions for summary judgment by the numerous defendants, and a motion by the plaintiff, Piedmont Resolution, for a voluntary dismissal. This memorandum opinion and order will address only the summary judgment motion by defendant First National Bank of Maryland [FNB] [# 73], whose participation in the transaction giving rise to the instant dispute was indirect due to, in FNB's words, its "misfortune to be chosen by one of Piedmont's lawyers to wire (for a $36 fee) Piedmont's $3 million to England." [FNB mot. at 1–2][1]. The tangential relationship between FNB and the plaintiff, and the fact that FNB's summary judgment motion was filed prior to Piedmont's motion for voluntary dismissal, leads the Court to resolve FNB's motion prior to turning to Piedmont's, which will be addressed in a separate memorandum opinion and order filed concurrently herewith. FNB's motion for summary judgment is opposed by the plaintiff, Piedmont Resolution, and partially opposed by three of the 14 codefendants, Lewis A. Rivlin, Lewis A. Rivlin, P.C., and Anne T. Taylor.

In its several-count First Amended Complaint, Piedmont alleges (1) breach of contract (count VI), (2) negligence (count VII), and (3) gross negligence (count VIII)[2] against defendant FNB.

Pursuant to 28 U.S.C. § 636(c), the parties consented to proceed before a U.S. Magistrate Judge for all purposes, including the entry of final judgment. Upon consideration of the motion, oppositions, reply and the applicable law, and for the reasons explained below, the Court concludes that First National Bank of Maryland is not entitled to summary judgment as a matter of law against the plaintiff, Piedmont Resolution, on counts VI, VII or VIII of the First Amended Complaint. Accordingly, FNB's motion for summary judgment shall be denied.

## I. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). "Federal Rule of Civil Procedure 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Id.* at 247–248.

A material dispute of fact "is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth", *Hirschhorn v. Sizzler Restaurants Int'l Inc.,* 913 F.Supp. 1393, 1397 (D.Nev.1995); "[a] dispute of fact 'is *genuine* ... if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Haysman v. Food Lion, Inc.,* 893

---

1. It appears, however, that someone from FNB solicited Rivlin's business. [*See* Rivlin depo., 93:13–24; *see also* Lee depo., 11:1–5 ("...[Anna Coates]...told me that Mr. Rivlin was going to be coming in to open up an account. He was a friend of Janet Farrel's, who's another officer in the bank".)]

2. The gross negligence count was added by the First Amended Complaint for which leave was granted to the Plaintiff to file on March 14, 1997, three days after FNB filed its motion for summary judgment. FNB did not directly move for summary judgment on the gross negligence count in its reply filed May 9, 1997; instead, FNB simply stated in footnote 14, "Obviously, since Piedmont's negligence claim against FNB is legally deficient, its gross negligence claim against FNB is also necessarily deficient." [FNB reply at 17, n. 14].

F.Supp. 1092, 1099 (S.D.Ga.1995)(quoting *Anderson*, 477 U.S. at 248).

If the moving party makes a sufficient showing pursuant to Rule 56(c), then the nonmoving party must come forward with affidavits and/or other evidence as provided by Rule 56(e), setting forth specific facts showing that there is a genuine issue for trial; the party opposing summary judgment may not rest upon the mere allegations or denials of the adverse party's pleadings. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Viewing all facts and inferences in a light most favorable to the non-moving party, *Tao v. Freeh*, 27 F.3d 635, 638 (D.C.Cir.1994)(citing *Anderson*, 477 U.S. at 250), the Court concludes that genuine issues of material fact exist, thus FNB is not entitled to summary judgment as a matter of law. To find otherwise would force the Court to make credibility determinations, which is the role of the jury, not the Judge.

## II. CHOICE OF LAW

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1332(a). The parties have not raised any choice of law issues and, in their arguments in support of and in opposition to FNB's motion for summary judgment, all parties have relied solely on District of Columbia law. Accordingly, the Court will resolve the motion under District of Columbia law.

## III. ISSUES OF MATERIAL FACT—DISPUTED AND UNDISPUTED

It is unnecessary for the Court to recite the entire history of the transaction giving rise to the instant dispute—the purchase of a non-existent 108% *per annum* bank guarantee for $1.5 million. It suffices to say that this is a classic "tale" (a term artfully used by Piedmont and FNB) of a situation where, in retrospect, a deal sounded *too good to be true* from the beginning and, consequently, it was.

Only hindsight, however, is 20/20, and thus necessarily capable of distinguishing a legitimate business transaction from a "prime bank instrument scam". [*See* Interagency Advisory, FNB mot., exh. 42]. Accordingly, the Court must look at the events surrounding the transaction at their place in time, in 1995, when perhaps the scam was not as "easily recognized" as FNB alleges in its motion for summary judgment; otherwise FNB, a legitimate banking institution, "would have immediately rejected the request" and, thus, would not be defending this action today. [FNB expert.rpt., FNB mot., exh. 8, ¶¶ B, G].

For the purposes of this summary judgment motion, most of the material facts begin on Wednesday, December 13, 1995, when Ernest Reigel, Piedmont's attorney, entered into an escrow agreement with defendants Lewis Rivlin and his law firm, Johnston, Rivlin & Foley [JR & F].

The escrow or attorney trust agreement between Piedmont and Rivlin and his firm, JR & F, for the transfer of $3 million into Rivlin's escrow account is set forth in a letter dated December 13, 1995, from Reigel to Rivlin and counter-signed and initialed by Rivlin; it provides in pertinent part:

> The $3M that Piedmont will transfer to [Rivlin's] trust account will be held on behalf of Piedmont and will not be pledged, hypothecated, transferred or released except as follows:
>
> 1. In the event that pursuant to the Contract [Rivlin] and an authorized representative of Piedmont (that will be [Reigel]) initially) execute joint instructions to your trust account bank to issue by S.W.I.F.T. wire the agreed upon MT–100 Field 72 Cash Backed Conditional S.W.I.F.T. wire under procedures substantially in the form attached hereto as EXHIBIT A.
>
> 2. If after ten (10) banking days from the date Piedmont's funds are deposited in your trust account, the release of the funds pursuant to paragraph 1 above has not occurred, Piedmont's authorized representatives may by written request direct [Rivlin] to return the funds immediately to Piedmont.

It is agreed that [Rivlin] will have no other obligations to Piedmont other than as described herein and no third party shall have any claim against Piedmont's funds in your trust account except as authorized in writing by Piedmont to you. In addition, we understand and agree that any escrow fees or other charges that [Rivlin or Rivlin's] bank will charge will be paid by Mr. C.P. Jones of Deerfield Holding Co., Inc.

[FNB mot., exh. 19]. Exhibit A noted in paragraph 1 (above) of the escrow agreement, however, was not attached to this letter agreement because "time was of the essence, according to the other parties involved, that we needed to hurry or we would miss the opportunity...[and] Rivlin had assured [Reigel/Piedmont] that the wire instructions could be worked out and would be worked out before anything happened with the money." [Reigel depo., 87:20–88:9]. Although the attorney trust agreement was between Rivlin and Piedmont, Jones was compensating Rivlin (and his firm) with "a percentage of the completed transaction." [Rivlin depo., 60:4–20].

Rivlin expressed his concerns about the transaction to Reigel. [Rivlin depo., 139:4–8; see also Reigel's notes, Rivlin opp., exh. A]. Reigel assured Rivlin "that in the wire room they would make the final decision of how to convey that condition within the number of lines and the number of characters available for field 72 [of a conditional S.W.I.F.T.]." [Rivlin depo., 143:15–19]. From Reigel's assurances and instructions with respect to the line and character limitations, Rivlin believed "Reigel had spoken to somebody expert [with S.W.I.F.T.]". [Rivlin depo., 92:1–93:6].

Rivlin's understanding of "conditional" was "that there was to be a use of an MT–100 screen 72." [Rivlin depo., 52:7–10]. Rivlin did not independently know what that meant, but had previously used S.W.I.F.T. [Rivlin depo., 52:11–17]. Rivlin was under the impression he could obtain a "S.W.I.F.T. 100 Field 72" "form and study it", which he tried to do at NationsBank where Rivlin's trust account was located, but "[t]he people at the branch level had no idea what [Rivlin] was talking about." [Rivlin depo., 53:6–25; 55:2–24].

On December 14, 1995, despite Reigel's (and Rivlin's [Rivlin depo., 326:5–25]) earlier reservations about Jones or anyone else having a power of attorney [Reigel depo., 107:3–18], Reigel, on behalf of Piedmont, gave C.P. Jones a "Limited Power of Attorney", which provided:

We hereby confer upon you a Limited Power of Attorney to act for and on behalf of Piedmont Resolution, LLC, c/o Ernest W. Reigel, Moore & Van Allen, PLLC,...for the purpose of the designated limited partnership, Transaction Code: EFS494899731A.

You are hereby authorized and employed with full responsibility to negotiate; open and close account(s); transfer, and disburse funds to appropriate parties as per our instructions; and act as the financial advisor for the benefit of the limited partnership (Contractual Agreement).

We hereby grant to you this Limited Power of Attorney this day, December 14, 1995, and this power is valid for one year and one day from this date.

[FNB mot., exh. 21; see also Reigel depo., 56:15–57:6]. Thus, Jones became the attorney in fact. [Reigel depo., 57:3–6]. Reigel agreed to Jones having the power of attorney "[b]ecause the way [Reigel/Piedmont] had established how the money was going to be handled through Mr. Rivlin's trust account and with Mr. Rivlin's assurances gave [Reigel/Piedmont] plenty of comfort that [Reigel/Piedmont] weren't exposed by [Jones] having that power of attorney. In other words, the power of attorney would not be able to be exercised until we either got in our hands the guarantee for the 108 percent or had some other form of collateral that would protect us." [Reigel depo., 108:12–21].

On Friday, December 15, 1995, Reigel, on behalf of Piedmont, transferred $3 million into Rivlin's trust account at NationsBank in Washington, DC. [FNB mot., exh. 22]. Rivlin, unable to work out the funds transfer procedures with NationsBank [Rivlin depo., 55:4–24], opened a new trust account (with Reigel's concurrence [FNB mot., exh. 23]) at a Washington, D.C. branch of FNB. [FNB

mot., exh. 38]. While opening the account, Rivlin explained to FNB employee Donald R. Lee that he:

> had clients who wanted to use the facility of [Rivlin's] attorney trust account to make a conditional transfer of $3 million to England and that it would be done on an MT–100/72. [Rivlin] had a copy [of the instructions] with [him] when [he] talked to [Lee] of what was required. [Lee], too, did not know that there was no such form as a form because he tried to get a form for me. He then learned that there was no such form but indicated they could nevertheless make a conditional transfer consistent with the requirements of my client.

[Rivlin depo., 94:15–95:1]. Rivlin concedes that he did not know how much Lee "knew then about what the limitations were on a Field 72", but Rivlin asserts that he "told [Lee] specifically [that Rivlin] wanted an MT–100 Field 72", and that it was to be conditional, and showed him the two-page instruction draft indicating that the funds were to be held until a particular event occurred in an effort to explain his client's request. [Rivlin depo., 95:7–96:13]. Rivlin explained to Lee that "the funds wouldn't be distributed in accordance with the contract until the bank in England had expressed its willingness to accept the money and promise to have in place a bank guarantee of 108 percent." [Rivlin depo., 96:22–97:8]. Lee showed "no indication whatsoever that [the conditional transfer] wouldn't be readily done and just as required." [Rivlin depo., 97:9–13].

Rivlin indicated to Reigel and Jones in a letter of the same date, December 15, that FNB "seemed more up-to-speed, and were offering, and have provided, very personal service." [FNB mot., exh. 23; *see also* Reigel depo., 142:5–10]. In the same letter, Reigel advised that Lee, with whom Rivlin opened the account, indicated that the funds, if transferred Monday, December 18, would arrive in England on Tuesday, December 19, 1995. [FNB mot., exh. 23]. Rivlin further expressed confidence that, working with FNB, "the funds are now on a path that will lead to a prompt and effective transfer on Monday to get your transaction started on Tuesday." [FNB mot., exh. 23.].

Lee recalls the events of December 15, 1995, rather differently:

> [Anna Coates] told [Lee] that Mr. Rivlin was going to be coming in to open up an account...He came in and opened an account and introduced himself to me. [Lee] [d]o[esn]'t remember the specifics of the conversation. But [Lee] opened the account and that was about the extent of it.... [Lee does not recall] any conversation about a wire transaction that was going to occur...Several days later [FNB] received a big wire for [Rivlin] and then [Rivlin] called [Lee] to tell [him] that [Rivlin] was going to be wiring that money out [and gave no other details], [and] came in that day.

[Lee depo., 11:17–12:20]. Lee denies any discussion with Coates about a wire transfer. [Lee depo., 11:6–13]. Lee recalled receiving $75 for opening the account, and that Rivlin was a friend of Farrell [*see supra* n. 1], but Lee did not recall Rivlin telling him why he opened the account. [Lee depo, 36:13–37:6]. Lee said that if Rivlin had "mention[ed] a SWIFT wire designated an MT–100 field back 72" it "would have definitely raised a red flag with [him], so when [he] sa[id]] that [he doesn't recall such a conversation], [he] said it very confidently." [Lee depo., 13:10–17]. It raises a red flag with Lee "[b]ecause to the best of [his] knowledge there is no such thing as a conditional wire." [Lee depo., 13:18–21].

Lee could not explain why he had written on his daily planner for the date of December 15, 1995, "call Anna about Mr. Rivlin's wire". [Lee depo., 37:12–24; pl's opp., exh. E].

Over the weekend (December 16–17) when Rivlin was to draft the "attachment to the MT 100/72" [FNB mot., exh. 23; *see also* Reigel depo., 100:11–22], Jones called Rivlin and told him he was sending him "[w]hat was going to be the attachment to the contract, the final version of the agreement as to his instruction on the conditional S.W.I.F.T. wire." [Rivlin depo., 180:19–24; FNB mot., exh. 24].

"It was [Rivlin's] understanding that this was the version that was the latest and [he] had understood from Mr. Jones that he was sending [Rivlin] what was [Jones' and Piedmont's] final draft, their final document." [Rivlin depo., 180:8–12]. Rivlin attempted to call Reigel on behalf of Piedmont, Rivlin's client, at his home and office numbers, but did not reach him. [Rivlin depo., 180:25–181:18].

On Tuesday, December 19, Rivlin proceeded to FNB with the two-page "wire transfer procedures" from Jones. Lee, however, was with a customer, so Melissa Rempe Holt (Ms. Rempe at the time) volunteered to complete transaction. [Rivlin depo., 97:23–98:6].

According to Rivlin,

[He] came in expecting to see Don Lee. [Rivlin] talked to [Lee] briefly. [Lee] introduced [Rivlin] to [Holt]. [Lee] had a desk out front. [Holt] appeared to be occupying an office behind him. The implication was that she was the more senior of the two. [Rivlin] sat down to explain in detail what it was [they] had to accomplish, and [Holt] had to ask a couple of questions of Mr. Lee before [they] could even get started. * * * [Rivlin] explained that [they] had to transfer by an MT–100 screen 72 conditionally funds that would go from [Rivlin's] account to an account in England. And [Rivlin] gave [Holt] the details of the account and that this was to be a conditional transfer because there was supposed to be a guarantee of 108 percent that would come to [Piedmont]. And it was to come back to [Holt]—although it was Mr. Lee that [Rivlin] kept checking if it had arrived yet—come back to [Holt]. That would confirm that the bank had a 108 percent guarantee or it was communicating that they were about to in authorizing the transaction to commence. [Rivlin] went through, in other words, all the details that are in the attachment to the agreement, explaining as much as [Rivlin] could about each aspect of it. [Holt] talked to the wire room during—after talking to Don Lee about some aspects of it, and I don't remember what they were. [Holt] talked to the wire room and then told [Rivlin] that the MT–100 transfer, that it was limited in terms of how [Piedmont] could express the guarantee. Mr. Reigel had explained to me that we had a limitation of six lines and the bank would compress them into the right section. * * * [Rivlin and Holt] discussed this issue [of the six-line limitation]...And the question was how to get the limiting instructions to go over with this S.W.I.F.T. wire. And it ended up...with [Holt] telling [Rivlin] that she would send the attachment physically that [Rivlin] had given her to the wire room. And that was [Rivlin's] understanding at the time [he] left. [Rivlin] had made a slight change in the form to make sure that [FNB] didn't convert it to pounds but the transaction would be done in dollars. [Rivlin] just left with the most complete understanding that [Rivlin] had spoken directly to her mind and [Holt] had understood the importance of this aspect of it and that she was going to attach those two pages to what she would send to the wire room so they could handle the manner in which it would go over. But [Rivlin] left with the impression that physically these pages were going to be transmitted to England in addition to whatever was to be put on the MT–100.

[Rivlin depo., 98:11–99:25; 100:1–23].

"Rivlin didn't know [what language could be typed into Field 72]. That was why [he] understood that the bank itself with experience in sending MT–100 Field 72 cash backed conditional S.W.I.F.T. wires was, as [Reigel] instructed [Rivlin], to take it upon themselves to make sure the condition was clearly stated within the limits of the Field 72." [Rivlin depo., 112:19–113:2]. Rivlin "came away from [his] discussion with [Holt] thinking that the bank in England was going to get this document, in addition to getting the S.W.I.F.T. message...that it was not only going to be attached by [Holt] and sent to the wire room, so that the wire could be sent consistently with what Jones and Reigel wanted, but that the physical two pages were going to arrive there and be cross referenced by the, by the—the S.W.I.F.T.* * *[Holt] was accepting [the two pages] on that basis [that it was accepted procedure]." [Rivlin depo., 352:4–20]. Rivlin said he "had no question, when [he] left [FNB], that these

pages were not only attached to what she was sending up there, to the wire room in Baltimore, but that they would be physically referenced, I mean, referenced in the text of what was being sent and in their hands, so they could interpret the wire, but the wire, the S.W.I.F.T. wire, was the effective instrument with whatever they had to say in the Field 72 to convey what was important to convey from this [two-page instructions] and that, for explanatory purposes, they would be holding this [two-page instructions], physically, as they were reading the S.W.I.F.T. wire." [Rivlin dep., 352:25–353:11].

Rivlin "did not know what the bank was going to say," [Rivlin depo., 349:11–14], which is consistent with the "Application and Agreement for Foreign Transfer", which provided for the wire room to designate the codes. [See infra at 13 (quoting ¶ 5)]. In Rivlin's mind, "[a]s long as we had conveyed what it was that we needed to have as the condition, which [Rivlin] thought we had, The [sic] concept of its going from Baltimore to England and physically ending up, [Rivlin] didn't know, but [his], in [his] own mind, whether [he] fully understood how a SWIFT worked, and that [Holt] had said this would go with it, what [Rivlin] think[s] [he] was seeing in [his] mind was that simultaneously that [two-page instruction] run through a fax machine and it would come out the other end. There are lots of ways of conveying messages from point A to point B." [Rivlin depo., 288:9–20].

In the course of his discussions with Rempe, Rivlin signed an "Application and Agreement for Foreign Transfer", which FNB argues is a contract setting forth the exclusive rights and obligations of the parties, and does not provide anywhere for a conditional transfer of the funds to the Midland Bank in England. The "Application and Agreement for Foreign Transfer", provides in pertinent part:

This application is accepted only on the following terms and conditions.

1) To be transacted & received in USD.

* * *

5) [FNB] may send any message relative to this transfer in explicit language, code or cipher, and it shall not be responsible for errors, delays or defaults in the transmission or delivery of messages in execution of this order by telegraph, cable, wireless, foreign governmental telegraphic services, or by letter, postal remittance by the post office of this or any foreign country, or by any express company, nor shall it be responsible for any loss or damage in consequences of any cause beyond its control, all of which risks are assumed by the purchaser.

[FNB mot., exh. 27]. The entire Agreement was preprinted to which Rivlin made one alteration—he crossed through term and condition no. 1, and wrote in the term and condition as it is noted above.

Rivlin concedes that there is nothing in the Agreement or the printout that he signed that refers to the funds transfer as being conditional; that he "obtained no signature from a bank officer on the MT–100 procedures documents"; that he "didn't ask to see the text of any S.W.I.F.T. message before it left the wire room"; that he didn't "speak to anyone in the wire room to determine what Field 72 on the S.W.I.F.T. message was going to say"; and that he "didn't speak to anyone in the wire room about the possibility that the MT–100 procedures document would be physically transmitted to England"; or "confirm that Midland Bank had a copy of the contract between the parties". [Rivlin depo., 367:6–368:23]. Rivlin said he did not have Holt sign the document "[b]ecause the S.W.I.F.T. wire itself being sent was the authorization. [Rivlin] didn't feel that the— two signatures were relevant unless this [two-page instruction] was going to be the operational instrument and [he] did not believe this was, [he] thought the S.W.I.F.T. wire was, but that this [two-page instruction] was to give meaning to whatever the short-hand compression was that alerted them to these conditions." [Rivlin depo., 353:12–23].

As expected, Holt's and Lee's versions of the day's events are considerably different. Lee states that:

[He] saw [Rivlin] in the lobby. [Lee] was helping another customer. [Lee] may have said hello but that was the extent of it.* * *After Miss Holt met with Mr. Riv-

lin, that is after she took him over that day—...[Lee] do[esn't] recall having a conversation with [Rivlin]. [After Lee finished with his client, he and Holt] spoke about Lew [Rivlin], and she said he was a real nice guy, and the only specific thing she said was that he liked to drop names in his conversations with her. That was about the extent of it...[Lee did not] specifically remember authorizing that wire...But [he] know[s] [he] did it because [he] h[ad] to get it sent out.

[Lee depo., 12:21–25; 16:1–17:1]. Lee had no "recollection of Miss Holt giving [him] the documentation that Mr. Rivlin had given her." [Lee depo., 17:16–19] Lee said the procedure for authorizing wires is as follows:

"[Lee] will take a look at the first page, see if the numbers match with what's run on there, see if the account number matches, and if so, I go ahead and do my thing, and the wire is sent to the wire room at that point....[He] just approve[s] it. [He] go[es] ahead and go in the system, and [he] make[s] sure that everything correlates. If so, you press a button and it's gone. It's sent to the wire room at that point."

[Lee depo., 17:2–15]. Lee stated that Holt had "a lot" of experience with wire transfers; and had more experience than he with wire transfers. [Lee depo., 99:13–17].

Holt's recollection of the events that day is as follows:

[Rivlin] came in on appointment to open up an account with Don Lee, and [Holt] was introduced to him as, This is Mr. Rivlin.* * *Take good care of him.* * *[Rivlin] was introduced as someone we should have take [sic] good care of based on the fact that his wife knew Janet Farrell [someone 'fairly high up' in the FNB LPO office].* * * [Rivlin] came into the branch, and he had an appointment with Don Lee—well, he came in. I don't know if he had an appointment. [Holt] asked [Rivlin] if there was anything [she] could help him with, that Don was with another customer. No, he said. I have an appointment with Don Lee, and he said, okay, and he waited. As time went by, Don came over [to Holt] and said, [']I'm

going to be tied up longer than I thought. [Rivlin] wanted to do a wire, everything is okay. Just go ahead and process it for him, it's already been checked out.[']So, [Holt] said okay. And at that point [Holt] sat down with Mr. Rivlin, pulled out the documents required to deal an international wire, and began filling them out. [Rivlin] gave [Holt] a sheet of paper that had information pertaining to the wire on it, saying we can use this information to fill in this wire form.

[Rempe Holt depo., 14:9–16:25]. After Rivlin left, when Holt mentioned to Lee that it was a large wire, Lee told Holt "that it had been okayed". [Rempe Holt depo, 17:24–25]. Holt later elaborated about what she meant by that statement:

Q: "You testified earlier that when Mr. Lee first introduced you to Rivlin, he indicated that this wire transfer had already been okayed or authorized, is that correct?"

A: "Yes."

Q: "What did you mean by that?"

A: "Basically, that's what he told me. I believe that he had already known the details of the wire transfer from his setting up the appointment with Mr. Rivlin and that he had spoken with Anna Coates about it. I do not know who Anna Coates spoke with."

[Rempe Holt depo., 104:12–23]. Holt also said that, when working with Rivlin, she had "no idea" what a MT–100 was, so she "called international wire [at the main wire room in Baltimore] to see if they knew." [Rempe Holt depo., 19:2–10]. The wire room personnel told Holt that it was a "basic S.W.I.F.T."; the wire room personnel had never heard of a MT–100. [Rempe Holt depo., 19:15–23].

When asked whether she told Rivlin "that [he] couldn't use an MT–100", Holt said she "told him that [FNB] did not know what an MT–100 was, but [FNB] did use the S.W.I.F.T. wire system ." [Rempe Holt depo., 20:8–12]. Holt said Rivlin did not mention having conversations with Lee about using an MT–100. [Rempe Holt depo., 20:18–21]. Holt said she did not read any of Rivlin's two-page information except that pointed out

to her, that she did not see the word conditional anywhere on the two pages, and that her "general practice is not to read client's information unless [she's] instructed to do so." [Rempe Holt depo., 21:1–9]. Holt also said she "went to return [the two-page document] to [Rivlin], and he did say [she] could keep it in [her] files, which [she] stapled with the rest of [the] papers and did not look at it again." [Rempe Holt depo., 22:10–15].

Holt described the wire process as:

> ...first we fill out an international wire form, which has the contract on the reverse of it. [Holt] used it [sic] document to type it, and then [Holt] would enter it into the computer screen itself...We print out the screen, the computer screen, the client signs both the wire agreement with the contract and the computer screen printout...And then is over us [sic] by a second person in the branch. And then released to the wire room.

[Rempe Holt depo., 23:6–19]. Holt said that Lee authorized the wire after Rivlin left the branch. [Rempe Holt depo., 23:20–25], and that she gave Lee three or four pieces of paper [Rempe Holt depo., 35:3–5], but she was not present when [Lee] authorized it, so [Holt] did not know if [Lee] reviewed the attachments. [Rempe Holt depo., 24:21–24].

Holt added that she did the "standard wire", which means FNB "had one wire screen. There was no room to put conditions, any — we couldn't change the way the wire went. We fill in the screen with all the particulars to the wire, and that was it", and she did not understand at the time that "certain S.W.I.F.T. wires had fields you could put information in". [Rempe Holt depo., 37:2–14].

The funds were received by the Midland Bank in England on December 20, 1995. [Lea depo., 23:23–24:4]. The $3 million was credited to the USD account of Solicitor Michael Levy, re Anglo Associates Limited. [Lea depo., 29:3–5]. Levy was the only person who could authorize transfers from the Midland account. [Lea dep., 32:11–14].

On Wednesday, December 20, Rivlin fired off a letter via facsimile to Reigel, Larry McNeal (Piedmont Executive Manager [McNeal depo., 9:18–20]), and Jones, particularly noting to Reigel:

> We had agreed that [Rivlin] would not part with the money until there had been agreement in writing on the text to ensure that the guarantee would be in place before the trader could take and trade with the money. When, on Saturday, [Rivlin] began in earnest to draft language to submit to [Reigel], [Rivlin] fully appreciated that C.P. [Jones] and [Reigel] had already agreed in writing on what the text should be because it was an attachment to [Piedmont/Jones] contract. It seemed to cover everything, so [Rivlin] took no more time trying to improve what was already succinct and unambiguous text. The MT100/72 text you had both agreed to was glued on to our S.W.I.F.T. and they were transmitted together.

[FNB mot., exh. 29]. Upon learning the transaction had gone forward without prior approval of the instructions by Reigel, Piedmont "[q]uickly reviewed what [its] options were, and given [Rivlin's] assurances, [Piedmont/Reigel] relied on what he said and went forward with the transaction." [Reigel depo., 153:4–11].

Piedmont, in its complaint, claims that it had "previously expressed concern to Rivlin about whether these draft instructions were appropriate as S.W.I.F.T. wire instructions and sufficient to instruct [FNB] and Midland Bank regarding the conditional nature of the transfer." [1st amend. Compl., ¶ 29]. Reigel said that he "was concerned that based on [his] conversations with the S.W.I.F.T. Wire people that he needed to have a more limited instruction, fewer characters, and that it needed to be more concise, basically. [In response, Rivlin] basically said he cleared that with the bank and it was taken care of." [Reigel depo., 118:2–7]. Rivlin testified that it was his "understanding that these instructions complied with the contract. And [he] had understood, also....that people in England had copies of the contract." [Rivlin depo., 112:3–7].

On December 27, 1995, Alf Thornton, Program Director for Anglo Associates, sent a letter to Jones "request[ing] authorization from [Jones] to release funds in the amount

of usd $1,500,000, to initially pay the bank guarantee order". [FNB mot., exh. 32]. In response, on the same day, Jones "instruct[ed] Mr. Alf Thornton, Program Director, for and on behalf of the trade account 36790037, reference: Anglo Associates—Executive Firm Service, Inc., Midland Bank PLC, Manchester, England, to hereby authorize the release of funds in the amount of USD $1,500,000 . . . for the payment order of the bank guarantee from one of the top 25 West European Bank(s), and the balance of USD $1,500,000, . . . to be paid upon receipt of the bank guarantee in the trade account." [FNB mot., exh 33].

On December 28, 1995, without the issuance of a bank guarantee equaling 108% of the principal amount, but instead for the purchase of the 108% bank guarantee, Levy (after receiving authorization from his client, Stuart Robertshaw of Preston International (whose client was Anglo Associates), who received authorization from Thornton, who received authorization from Jones), directed that $1.5 be released from the account, which Piedmont now seeks to recoup by bringing this civil action. [Robertshaw depo., 13:15–18:23; 36:3–13]. With respect to FNB, Piedmont claims:

> Although Rivlin's instructions to [FNB] were deficient, [FNB] knew or should have known from Rivlin's instructions that a conditional transfer was intended. In particular, Rivlin handed [FNB] a document which clearly stated that the transfer was to be "CONDITIONAL." . . . [Rivlin] advised [FNB] that the transfer was to be conditional, an instruction [FNB] failed to heed. [FNB] failed to transfer the Funds to Midland Bank on a conditional basis and failed to adequately instruct Midland Bank as to the conditional nature of the transaction. Further, representatives of [FNB] had no knowledge of the appropriate codes to send a conditional S.W.I.F.T. wire. [FNB] ignored the clear written instruction in the document it was handed by Rivlin that the transfer was to be "CONDITIONAL," ignoring its duty to read the instructions. Though [FNB] knew or should have known that its acts and omis-

sions would damage, and did damage, Piedmont . . .

[1st amend compl., ¶ 32].

On January 18, 1996, Reigel, on behalf of Piedmont, sent a letter to Jones "pursuant to Paragraph 3 of the Contract" notifying Jones "and other parties to the Contract that [Piedmont] is terminating the Contract on the basis of non-performance and requests that all of its funds be immediately returned to [Piedmont's] trust account". [FNB mot., exh. 35]. And, on February 1, 1996, Reigel sent a facsimile to Levy stating:

> As we discussed today, this letter will confirm that on behalf of our client, Piedmont Resolution, LLC, we direct that you wire transfer back to my firm's trust account (the details of which are attached hereto) all the funds you currently hold in your trust account for Piedmont Resolution, LLC. It is our understanding that out of the original $3,000,000 wire transfer of Piedmont funds you now hold just under $1,500,000. We would appreciate it very much if you would initiate the wire transfer immediately with respect to those funds.
>
> We understand that the Manchester Police and the U.S.F.B.I. are looking into the people on the U.K. and European side of this transaction. We and Piedmont are fully cooperating wit the F.B.I. and encourage you to do the same on your side. Any assistance you can give us in recovering the balance of the $3,000,000 in our funds would also be greatly appreciated.

[FNB mot., exh. 37]. On February 23, 1996, Levy instructed Midland Bank to return $1,467,937.47 to FNB, Baltimore. [Lea depo., 41:8–12].

## IV. ANALYSIS

First National Bank of Maryland makes several arguments in support of its motion for summary judgment. On the first count (count VI), breach of contract, FNB argues (1) Piedmont has no standing to sue FNB; (2) FNB fully complied with all terms and conditions of the written agreement, which, as a matter of law, supersedes any prior understandings or verbal representations regarding the terms of the wire transfer; (3)

even if the Court were to consider evidence of FNB's alleged oral agreement to transfer the funds conditionally, the terms of any such agreement are too vague and indefinite to constitute an enforceable contract; and (4) FNB's alleged breach of contract was not the proximate cause of Piedmont's damages. [FNB mot. at 22].

FNB argues the negligence count (count VII) fails because (1) FNB owed no duty of care to Piedmont in performing its wire transfer agreement with Rivlin; (2) Piedmont knowingly assumed the risk that its funds would be stolen; (3) Piedmont and/or its agents (McNeal, Reigel, Rivlin and Jones) were contributorily negligent; and (4) FNB's alleged negligence was not the proximate cause of Piedmont's damages. [FNB mot. at 31]. FNB never directly moves for summary judgment on the gross negligence count. [*See supra* n. 1]

Each count will be addressed in turn; prior to that, however, the Court must look at the underlying transaction—the transfer of the Funds.

### A. Funds Transfers, U.C.C. Article 4A

"[E]lectronic funds transfers are transmitted in seconds and minutes over communications networks such as telex, CHIPS, FEDWIRE, and S.W.I.F.T." [S.W.I.F.T., FNB mot., exh. 7]. "Wholesale funds transfers are a payment mechanism by which the banking system facilitates the transfer of funds. In this sense, it is similar to the domestic check system but it differs from this system with respect to the dematerialization of the order which is not in negotiable form and with respect to volume. The average volume of funds transfers in the United States is US$3 trillion daily." [Def's expert rpt. (Byrne)[3], FNB mot., exh. 40, ¶ 24].

S.W.I.F.T. (Society for Worldwide International Financial Telecommunications, a privately operated international bankwire[4]) funds transfers, although distinguished in the

banking community from other payment systems [S.W.I.F.T., FNB mot., exh. 7], nevertheless generally fall under U.C.C. Article 4A, Funds Transfers. *See* U.C.C. Article 4A–105(a)(5)[5] & Official Comment, ¶ 3 (The term *funds transfer* "includes organizations that provide only transmission services such as S.W.I.F.T.").

■ Pursuant to Article 4A, a funds transfer is a completed act when the bank of the beneficiary of the transfer accepts a payment order. U.C.C. Article 4A–104(a). Such acceptance occurs at the earliest of: (1) when the bank pays the beneficiary or notifies the beneficiary of receipt of the order or that the account has been credited; (2) when the bank receives payment of the entire amount of the transfer; or (3) the beginning of the bank's next funds-transfer business day. U.C.C. Article 4A–209(b). "[A]n accepted transfer cannot be revoked without the consent of the beneficiary." *United States v. BCCI Holdings (Luxembourg), S.A.*, 956 F.Supp. 5, 11 (D.D.C.1997)(citing *Middle East Banking Co. v. State Street Bank Int'l*, 821 F.2d 897, 901–902 (2d Cir.1987)). The beneficiary's bank, here the Midland Bank if the transfer were to fall under Article 4A, "incurs an obligation to the beneficiary, here Michael Levy, upon acceptance of the funds." *Id.* (citing U.C.C. article 4A–404). "[T]he ownership interest in those funds passes from the originator [FNB] to the beneficiary's bank [Midland] upon completion of the funds transfer." *BCCI Holdings*, 956 F.Supp. at 11 (quoting *Shawmut Worcester County Bank v. First American Bank & Trust*, 731 F.Supp. 57, 60 (D.Mass.1990))("completion of a wire transfer 'extinguished Shawmut's 'ownership interest' in the funds as personal property' prohibiting recovery on a conversion theory").

Defendant's expert, James E. Byrne, points out that "[v]irtually all funds transfers are unconditional and banks will almost always refuse to send or execute a conditional

---

3. James E. Byrne's expertise lies with standby letters of credit, which is governed by U.C.C. Article 5. [FNB mot. exh. 40].

4. Patricia Brumfield Fry, *Basic Concepts in Article 4A: Scope and Definitions*, 45 BUS. LAW. 1401, 1424 n. 84 (June 1990).

5. U.C.C. Article 4A, Funds Transfers, which focuses on "wholesale wire transfer" as a form of payment system, was adopted by the District of Columbia by L.1992, D.C. Law 9–95, effective April 30, 1992.

funds transfer because of the added cost, difficulty, and unknown liability attendant upon it." [Def's expert rpt. (Byrnes), FNB mot., exh. 40, ¶¶ 25, 26]. Byrne carefully stops short of stating that a funds transfer cannot be conditional.

The disputed funds transfer as contemplated by Piedmont was conditional, and would fall outside the purview of the U.C.C. Article 4A because the instruction was to "state a condition to payment to the beneficiary other than time of payment", which is prohibited by U.C.C. Article 4A–103(a)(1)(i); *accord Sheerbonnet, Ltd. v. American Express Bank, Ltd.,* 951 F.Supp. 403, 406 (S.D.N.Y. 1995) *as amended* (May 01, 1996)(The funds transfer "must not state a condition for payment to the beneficiary other than time".); *see also* Official Comment following 4A–104, ¶ 3 ("The function of banks in a funds transfer under Article 4A is comparable to the role of banks in the collection and payment of checks in that it is essentially mechanical in nature.")

Another FNB expert, Raymond F. Barry [6], claims that "[s]imply stated, there is no such thing as a 'conditional' S.W.I.F.T. of the type apparently envisioned by [Piedmont], nor does the reference to 'MT–100 Field 72' in any way connote a conditional transfer." [FNB expert rpt (Barry). FNB mot., exh. 8, ¶ A]. Barry claims that "[a]n MT–100 is a basic 'message type' (thus the 'MT'), and 'Field 72' is simply a field in the basic MT-100 format in which certain very limited information, restricted to six lines of thirty-five characters each, may be inserted." [*Id.*]. One of Piedmont's experts, Hyman Silkes [7], agrees that, generally speaking, "[t]he MT–100 S.W.I.F.T. wire is not the appropriate procedure to wire funds on a conditional basis as, on its face, it is not a *conditional* wire." [Pl's expert (Silkes), FNB mot, exh. 9, at 2]. Silkes pointed out, however, that "it is possible to format a S.W.I.F.T. MT–100 payment order using Field 72 in such a manner that the receiving bank would not make

payment except as set forth in the Field 72 instruction. This Field is provided for bank-to-bank information ('BBI'). Additionally, code words are provided specifying for which bank the information is intended." [*Id.*].

Defense expert Byrne suggests that the fact that "Mr. Silkes in his expertise was able to structure a transaction which afforded some protection to the target is, however, irrelevant to what actually occurred. It only suggest that Mr. Rivlin should have consulted Mr. Silkes before sending the funds transfer." [FNB expert rpt. (Byrnes), FNB mot., exh. 40, ¶ 39]. The Court disagrees. Although all experts agree that S.W.I.F.T. was not the most appropriate means of conditionally transferring the $3M, the record before the Court demonstrates that S.W.I.F.T. was *a* means of completing a conditional funds transfer. As illustrated by the differing Rivlin, Lee and Holt versions of the funds transfer, there remains a question of material fact as to whether FNB, either through Lee or Holt, represented to Rivlin that the wire room would properly structure a conditional transaction via S.W.I.F.T. The "Application and Agreement" that Rivlin signed provided for the wire room to designate the codes. For that reason, the Court concludes that, for the purposes of the summary judgment motion, the disputed transaction—an unconditional funds transfers—falls outside the purview of U.C.C. Article 4A. With that in mind, the Court turns to the common law breach of contract and negligence counts.

## B. BREACH OF CONTRACT

### 1. Standing

FNB argues that it had no knowledge of Piedmont, the third party beneficiary of the disputed contract between Rivlin and FNB, thus the plaintiff has no standing to bring the breach of contract action. The Court disagrees.

---

**6.** Raymond F. Barry is retired from 32 years of Chase Manhattan Bank where his duties required "in-depth knowledge of banking practices, both foreign and domestic, payment systems rules and regulations". [FNB mot, exh. 8].

**7.** Hyman Silkes has 22 years of experience at Citibank, New York, and who is "[k]nowledgeable regarding global payment systems and recognized as an international expert in financial message standards and systems." [FNB mot, exh. 9].

"The right of the party to a contract to sue when damaged by the other party's violation of it does not depend upon the grant of such right by the terms of the contract itself...The question is, does the [plaintiff] fall within any exception to the general rule that a stranger to a contract may not sue to enforce its terms or to recover damages for a violation thereof?" *Marranzano v. Riggs Nat'l Bank of Washington, D.C.*, 184 F.2d 349, 350 (D.C.Cir.1950). "One who is not a party to a contract nonetheless may sue to enforce its provisions if the contracting parties intend the third party to benefit directly thereunder." *Western Union Tel. Co. v. Massman Constr. Co.*, 402 A.2d 1275, 1277 (D.C.1979). Reading the contract as a whole, the Court must determine whether Piedmont's benefit under the "Application and Agreement for Foreign Transfer" was "intended or incidental." *Id.* The absence of Piedmont's name on the Agreement is "not fatal to [its] claim, especially when the surrounding circumstances tend to identify the third-party beneficiary." *Id.*

Although the FNB/Rivlin Application and Agreement for Foreign Transfer—itself does not mention the plaintiff, Piedmont, by name, it appears undisputed that the wire transfer instructions that allegedly were to be "glued" to the wire transfer contained the name Piedmont. Produced in Piedmont's opposition to FNB's motion for summary judgment is a copy of the "MT-100 Field 72 Cash Backed Conditional S.W.I.F.T. Wire Transfer Procedures" that were given to Holt, and which contains a handwritten notation on the first page identifying Deerfield/Piedmont as the "Transaction Name:" [Piedmont opp., exh. D; Rivlin opp. at 3, n. 2]. Moreover, it is undeniable that Rivlin opened a trust account, which by definition is for the benefit of named or unnamed third parties. Accordingly, the Court concludes that the Bank was on sufficient notice that the transfer of funds from an attorney trust account was for the benefit of a third party beneficiary to the Agreement, Piedmont Resolution. Thus, Piedmont has standing to bring this action.

Piedmont also has standing to bring this action as the principal that contracted with FNB through its attorney/agent, Rivlin. "[A]n undisclosed principal may sue and be sued on a contract made by his agent... Even the fact that the agent denies that there is a principal, or represents himself to be the principal, is not sufficient to preclude suit by the undisclosed principal". *Cooper v. Epstein*, 308 A.2d 781, 783 (D.C. 1973) (citations omitted). Had the "Application and Agreement", by its express terms, provided that it was to "be effective only between the agent and the third party, the undisclosed principal may not enforce the contract" or if it were the intention of the parties (an issue to be determined by the fact finder), then the principal could not sue. *Id.* (citing, e.g., RESTATEMENT (SECOND) OF AGENCY ¶ 303 (1958)). Here, no express terms precluding suit by Piedmont, the FNB-asserted undisclosed principal, are found in the disputed Agreement; and no Rule 56 evidence has been presented to create a genuine issue of material as to FNB's and Rivlin's lack of intention to preclude a suit by the third-party beneficiary to the trust account and Agreement.

Accordingly, the Court finds that Piedmont has standing both as a third-party beneficiary and as an undisclosed principal to bring the breach of contract action against FNB. Defendant FNB's abandonment of this argument in its reply leads the Court to conclude that FNB concurs with this analysis.

### 2. Integrated Agreement / Parol Evidence Rule

FNB's second and third arguments in support of its motion for summary judgment on the breach of contract count are: 1.) that the written "Application and Agreement for Foreign Transfer" supercedes prior understanding Rivlin may have had with Lee, or verbal representations made by Lee or Rempe; and, 2.) even if the Court were to consider evidence of FNB's alleged oral agreement to transfer the funds conditionally, the terms of any such agreement are too vague and indefinite to constitute an enforceable contract.

A completely integrated agreement is one " 'adopted by the parties as the complete and exclusive statement of the terms of the

agreement.'" *Howard Univ. v. Good Food Serv., Inc.,* 608 A.2d 116, 126 (D.C.1992)(quoting *Ozerol v. Howard Univ.,* 545 A.2d 638, 641 (D.C.1988) *reh'g granted,* 555 A.2d 1033 (D.C.1989)(remanding for reconsideration of complete integration finding to include consideration of a factual stipulation previously overlooked by trial court), and citing RESTATEMENT (SECOND) OF CONTRACTS § 210). The Court's first step in determining whether the "Application and Agreement for Foreign Transfer" exclusively establishes the rights and duties of the parties is to address whether that was what Rivlin and FNB intended of the Agreement. *Good Food Serv., Inc.,* 608 A.2d at 126. If so, the contract is completely integrated, and no additional terms may be considered; if not, the agreement is partially integrated and "*consistent* additional terms may be shown.'" *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 210 comment a).

■ This preliminary question of fact, that courts have long called a question of law for the trial court, *1010 Potomac Assoc. v. Grocery Mfrs. of Am., Inc.,* 485 A.2d 199, 205 n. 6 (D.C.1984), "focus[es] on the intent of the parties at the time they entered into the agreement. This intent must be sought where always intent must be sought, namely, in the conduct and language of the parties and the surrounding circumstances. The document alone will not suffice.'" *Good Food Serv.,* 608 A.2d at 126–127 (quoting *Ozerol,* 545 A.2d at 641, and citing *Stamenich v. Markovic,* 462 A.2d 452, 456 (D.C.1983)). In addition to the written Agreement, the Court reviews "'[a]greements or negotiations prior to or contemporaneous with the adoption of a writing'" to determine whether the contract is completely or only partially integrated. *Good Food Serv.,* 608 A.2d at 127 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 214 & § 210, illustration 1). A merger clause—the presence or absence thereof, is only a factor in discerning the parties' intent. *Good Food Serv.,* 608 A.2d at 127.

■ In this preliminary assessment, the parol evidence rule does not apply; it will only "come into play" after (and if) the Court determines that the Agreement is completely integrated. *Id.*(citing RESTATEMENT (SECOND) OF CONTRACTS § 214 comment a, and *Ozerol,* 545 A.2d at 641–642). Thus, the inquiry into whether the contract is completely integrated includes a review of extrinsic—parol—evidence that will have to be excluded at trial if the court concludes the contract indeed is completely integrated. *Good Food Serv.,* 608 A.2d at 128 (citing RESTATEMENT (SECOND) OF CONTRACTS § 213).

■ Of foremost consideration in the construction of the contract is the parties' intentions. *Lamphier v. Washington Hosp. Ctr.,* 524 A.2d 729, 732 (D.C.1987)(quoting *Bolling Fed. Credit Union v. Cumis Ins. Society, Inc.,* 475 A.2d 382, 385 (D.C.1984)). If the parties' intent is ambiguous, summary judgment is inappropriate. *Good Food Serv.,* 608 A.2d at 127 n. 7 (citing *International Bhd. of Painters and Allied Trades v. Hartford Accident and Indem. Co.,* 388 A.2d 36 (D.C. 1978)). Generally speaking, if contracting parties have "reduced their entire agreement to writing, the court will disregard and treat as legally inoperative parol evidence of the prior negotiations and oral agreements,'" *Stamenich,* 462 A.2d at 455 (quoting *Giotis v. Lampkin,* 145 A.2d 779, 781 (D.C.1958)), and construe the written contract in such a way to "'give meaning to all of the express terms.'" *Construction Interior Sys., Inc. v. Donohoe Co., Inc.,* 813 F.Supp. 29, 33 (D.D.C.1992)(quoting *Bolling Fed. Credit Union,* 475 A.2d at 385). If the "provisions in question are reasonably susceptible of different constructions or interpretations", however, the contract is ambiguous. *1901 Wyoming Ave. Coop. Assoc. v. Lee,* 345 A.2d 456, 461 n. 7 (D.C.1975) (citation omitted); *accord United States Dep't of Labor v. Insurance Co. of North America,* 131 F.3d 1037, 1042 (D.C.Cir.1997) (citing *Bennett Enters., Inc. v. Domino's Pizza, Inc.,* 45 F.3d 493, 497 (D.C.Cir.1995)).

The contract in dispute in the instant action, the "Application and Agreement for Foreign Transfer", is set out in pertinent part *supra* at 44. Of the seven numbered paragraphs to the Agreement, the most pertinent to this discussion of ambiguity is no. 5 which provides: *"[FNB] may send any message relative to this transfer in explicit lan-*

*guage, code or cipher,* and it shall not be responsible for errors, delays or defaults in the transmission or delivery of messages in execution of this order by telegraph, cable, wireless, foreign governmental telegraphic services, or by letter, postal remittance by the post office of this or any foreign country, or by any express company, nor shall it be responsible for any loss or damage in consequences of any cause beyond its control, all of which risks are assumed by the purchaser." [FNB mot., exh, 27 (emphasis added)].

This paragraph completely leaves open the exact code language that is to be used in sending the funds transfer. The code language goes to the very heart of the transaction; thus, the contract cannot be said to be completely integrated.

Even if the Court were to consider the written contract completely integrated, based on ambiguous paragraph no. 5, it would still have to permit the jury to look at parol evidence because the contract does not specify the language or code FNB will use to transfer the funds—conditionally or unconditionally. *King v. Industrial Bank of Washington,* 474 A.2d 151, 155 (D.C.1984)(parol evidence is admissible if the court finds that the contract is ambiguous, which is a question of law); *see also Good Food Serv., Inc.,* 608 A.2d at 127 n. 8 (quoting II FARNSWORTH ON CONTRACTS § 7.3, at 207)(" '[E]ven the finding of a completely integrated agreement does not preclude a showing of a "collateral agreement," as long as it does not contradict the main agreement.' "); *accord Stamenich,* 462 A.2d at 455. The parol evidence that Piedmont asks the Court to consider is consistent with the terms and conditions of the "Application and Agreement"; it simply clarifies those terms, i.e., "message relative to this transfer in explicit language, code or cipher", referenced but not identified in paragraph no. 5 of the Agreement. It does not " 'contradict, vary, add to, or subtract from' " the Agreement. *Stamenich,* 462 A.2d at 455 (quoting *Fistere, Inc. v. Helz,* 226 A.2d 578, 580 (D.C.1967)).

As one of FNB's experts (Byrne) points out, the Application and Agreement for Foreign Transfer contains "no provision for a conditional transmission in the form and none is indicated in it as it is filled out." [FNB expert rpt. (Byrne), FNB mot., exh. 40, ¶ 35]. And as Byrne further pointed out: "In taking customer requests for funds transfers, retail banking personnel are trained to assist customers in filling out predesigned forms and in identifying needed codes. They are not trained nor they provide advice regarding the underlying transaction." [*Id.* at ¶ 34]. Neither Piedmont (through its agent Reigel) nor Rivlin claim to have sought advice about the underlying transactions, which does appear to have been a scam. The only concern allegedly brought to FNB's attention was the conditional nature of the funds transfer. And although FNB argues that "none of these alleged [oral] representations [by Holt and/or Lee] sets forth *any* 'specific terms' of an agreement 'to transfer [the funds]...by S.W.I.F.T. wire on a conditional basis' " [FNB mot. at 27 quoting 1st amend compl. ¶ 70 and citing *Stansel v. American Sec. Bank,* 547 A.2d 990, 993 (D.C.1988)], the written contract neither provides any "specific terms". Thus, parol evidence of an alleged contemporaneous verbal agreement regarding conditions of the transfer creates no greater ambiguity than that already existing in the written contract. Thus, whether and to what extent a contemporaneous oral agreement existed setting forth the type of funds transfer according to which the codes would be selected by the wire room, which is consistent with the written contract, must be a question for the jury. From the extrinsic—parol—evidence (which includes the contemporaneous letters by Rivlin generated in the ordinary course of the transaction), the jury will determine "the circumstances surrounding the making of the contract" and decide what a reasonable lawyer and banker (based on expert testimony) would have done and understood. *1010 Potomac Assoc.,* 485 A.2d at 205–206 (citations omitted); *id.* at 207 n. 11 ("Extrinsic circumstances surrounding the execution of a contract may be considered only to aid in determining the meaning of the contract, not to alter its terms."); *accord 1901 Wyoming Ave.,* 345 A.2d at 461–462; *Lamphier,* 524 A.2d at 732 (D.C.1987)(citing *1010 Potomac Assoc.,* 485 A.2d at 205–206). Rivlin, as a lawyer, and Lee and Holt, as bank employ-

ees, are bound by all usages which the parties knew or had reason to know. *Sagalyn v. Foundation for Preservation for Historic Georgetown,* 691 A.2d 107, 111 (D.C.1997) (citations omitted).[8]

FNB elected to place this burden on itself—its wire room, by drafting and using the pre-designed "Application and Agreement for Foreign Transfer" which vaguely obligates itself to "send any message relative to this transfer in explicit language, code or cipher...". "Relative to this transfer" by its very terms denotes concern to the individual client needs, notwithstanding which FNB dismisses the idea that paragraph no. 5 "somehow incorporates additional and unidentified 'terms and conditions' concerning 'individual clients' needs'", arguing that it merely "states the obvious: that the electronic wire transfer identified in the Agreement will in fact be transmitted in appropriate language." [FNB reply. at 7 n. 7]. The Court cannot conceive of how the wire room will determine the appropriate language if it is unaware of the client's needs. Again, FNB's expert stated the bank personnel are trained to assist clients in "filling out pre-designed forms and in identifying needed codes". [FNB mot., exh. 40, ¶ 34]. It is those needed codes that are at the heart of this contract dispute. Moreover, despite the contract placing the onus on FNB to determine the appropriate codes, Lee, the FNB employee who undertook to authorize and send the funds transfer to the wire room and who allegedly made promises to Rivlin regarding the conditional nature of the funds transfer, admitted that the all-important transmittal codes "do[n't] mean anything to [him]." [Lee depo., 84:18–85:14].

▇▇▇ In sum, it remains a question of fact where FNB, a bank with a small presence in the District of Columbia and wanting of Rivlin's business, contracted with Rivlin to send the funds unconditionally. This question remains irrespective of whether Rivlin's two-page instructions themselves would have achieved that goal, as it is FNB that selects the codes "relative to" the transfer.

The Court is mindful that all the experts, including Piedmont's, agree that Rivlin did not have the proper instructions when he entered FNB on the 19th of December. But, the Court cannot reconcile for the purposes of summary judgment the experts' reports that any legitimate bank would have turned Rivlin away if it had seen the instructions and known of Piedmont's intentions, and yet a hotly disputed issue of material fact is whether FNB was fully apprized of Rivlin's expectations of FNB, and whether FNB represented to Rivlin that conditional funds transfer was no problem.

▇▇▇ "[W]hether a contract is integrated or not, its meaning must be determined 'in the light of the circumstances' at the time the contract was made." *1010 Potomac Assoc.,* 485 A.2d at 206 n. 7 (citing RESTATEMENT (SECOND) OF CONTRACTS §§ 202(1), 212(1) (1981)). All the information that has come to light (including the unrelated criminal charges) since the funds transfer does not overshadow the ambiguities of the Agreement and the disputed, conflicting testimony before the Court of the circumstances and discussions between FNB and Rivlin when FNB, pursuant to the Agreement, undertook to transfer the $3 million to England. Accordingly, the Court cannot find that, as a matter of law, the Agreement is a complete and exclusive statement of the terms of the parties agreement.

**8.** FNB argues that "information concerning the essential elements of a prime bank instruments scam was well known in the banking and legal communities during and well prior to December 1995, and the transaction at issue here bore all the earmarks of such a scam, which Piedmont (and in particular, its chairman, Mr. McNeal, who has testified that he was an officer or director of a bank) its lawyer should have immediately and easily recognized." [Def's exh., FNB mot., exh. 8, ¶ G]. Certainly, the Court cannot hold Piedmont and Reigel to a higher standard to which it holds FNB. Whether any or all parties to this contract should have recognized the scam based on information they individually had is a determination to be made by a jury. Of note, McNeal was an outside director and equity chair of CB & T Bank (also known as International City Bank) of Miller, Georgia from the mid-1980s to 1990 or 1991 [McNeal depo, at 17:14—18:22], prior to the period in which these prime bank instrument scams came en vogue. [*See also infra* at 35 (discussing the negligence counts)].

### 3. Proximate Cause

FNB's final argument with respect to the breach of contract claim is that the alleged breach of contract was not the proximate cause of Piedmont's damages. The Court, having concluded that, as a matter of law the contract is not completely integrated, the Court cannot reach the issue of whether the breach of contract is the proximate cause of the injury. As Piedmont quotes in its opposition [Pl's opp. at 39], the District of Columbia Court of Appeals has said:

> It is basic law that the proximate cause of an injury is ordinarily a question of fact for the jury. Only if there were absolutely no facts or circumstances from which a jury could reasonably [find that FNB breached a contract to send the funds conditionally], would the question have been one for the court. But if, as here, the facts are such as to cause reasonable men to differ, then *the question is clearly one for the determination of the jury.*

*McCoy v. Quadrangle Dev. Corp.*, 470 A.2d 1256, 1259 (D.C.1983) (citation omitted). If the jury concludes that the money would not have been accessible to the so-called fraudsters in England had FNB not failed to send the funds conditionally as it is argued it was contracted to do (if it was contracted to do), or had not orally represented that it could send the funds conditionally, then the jury could find that FNB's actions were the proximate cause of the Piedmont's injuries, and Piedmont's actions thereafter were only an effort to mitigate its damages. Or, a jury could conclude that Piedmont's (and its agents) actions after the funds were transferred to England unconditionally broke the causal chain. Regardless, proximate cause is a question of fact for the jury.

### C. Negligence & Gross Negligence

#### 1. Standard of Care

 Having determined that Piedmont was the third-party beneficiary and the principal to the wire transfer, and thus entitled to a reasonable standard of care by FNB in conducting the funds transfer, and that this dispute falls outside of Article 4 of the U.C.C., the Court will consider the negligence counts against defendant FNB. *See*

*supra* at 49–50 (discussion of standing); *see also Aleo Int'l, Ltd. v. Citibank, NA,* 160 Misc.2d 950, 951, 612 N.Y.S.2d 540, 541 (1994)(U.C.C. Article 4A does not provide for a cause of action in negligence). In order for Piedmont to establish that FNB was negligent, it "must prove that the defendant deviated from the applicable standard of care" in performing the S.W.I.F.T. funds transfer. *District of Columbia v. Peters,* 527 A.2d 1269, 1273 (D.C.1987)(citing *District of Columbia v. White,* 442 A.2d 159, 164–165 (D.C. 1982)).

 As the parties have recognized, expert testimony is required to establish the standard of care for employees of FNB and of Piedmont's attorneys. *Id.* "Evidence of compliance with a statutory or administrative norm neither establishes due care nor prevents a finding of negligence." *Scoggins v. Jude,* 419 A.2d 999, 1002 (D.C.1980). The Court has seen a sampling of what the parties' numerous experts will testify to at trial, and it is FNB's own experts' reports that belie FNB's entitlement to summary judgment as a matter of law. For example, FNB expert Barry states:

> Field 72 in an MT–100 S.W.I.F.T. would have been a wholly inappropriate mechanism by which to communicate a condition of the type apparently contemplated by the plaintiff. **In my professional opinion, FNB, had it been apprised [sic] of plaintiff's wishes, would have immediately rejected the request. Moreover, even if, hypothetically, FNB had attempted through some means to fashion a Field 72 that set up the sort of condition contemplated by plaintiff, the receiving bank in England would not have accepted it.**

[FNB expert rpt (Barry), FNB mot., exh. 8, ¶ B (emphasis added)]. At the very least, there is a material dispute about whether FNB was on notice (through Rivlin) of Piedmont's wishes and whether FNB then responded with the appropriate standard of care. Moreover, as Barry pointed out,

> Ms. Holt of FNB has testified that she was experienced in sending wires; anyone with this experience would know that there is

no such thing as an 'attachment' to a S.W.I.F.T. or any form of wire, or a procedure for 'gluing' a piece of paper to an electronic S.W.I.F.T. message.

[FNB expert rpt (Barry), FNB mot., exh. 8, ¶ D]. It, therefore, is in the province of the jury to weigh the conflicting testimony and determine whether Holt was apprized of the conditional nature of the funds transfer, and thus whether FNB was negligent in making a contemporaneous oral agreement consistent with paragraph no. 5 of the written Agreement to send the funds conditionally and in not selecting the appropriate codes to transfer the funds conditionally and, in the alternative, in agreeing to accept the transaction.

The FNB expert further noted that "[i]nformation concerning the essential elements of a prime bank instruments scam was well known in the banking and legal communities during and well prior to December 1995, and the transaction at issue here bore all the earmarks of such a scam, which Piedmont (and in particular, its chairman, Mr. McNeal, who has testified that he was an officer or director of a bank) and its lawyer should have immediately and easily recognized." [FNB expert rpt (Barry), FNB mot., exh. 8, ¶ G]. FNB cannot ask the Court to hold McNeal, someone who held a banking position far removed from the funds transfer department prior to the onset of prime bank instrument scams, to a higher standing than the funds transfer personnel at FNB at a time when "prime bank instruments scam was well known in the banking and legal communities." Only a jury can make such credibility determinations.

One of plaintiff's experts engaged to demonstrate that FNB deviated from the standard of care expected of a legitimate banking institution reports:

MT–100 wires are not generally considered to be conditional. However, I observed in the document which was allegedly the instruction for the S.W.I.F.T. wire ...that the word "Conditional" is used in more than one location, including in the title. This should have raised a question in the mind of anyone familiar with S.W.I.F.T. wire procedures, most particu-

larly a banker, that money was to be sent conditionally, or at least not completely unconditionally. At that point, any such person, including a banker, would know that either (a) a different procedure should be used because MT–100's are unconditional or (b) to make the MT–100 conditional, the instruction had to contain the information set forth [in Silkes' expert report].

[Pl's expert rpt. (Silkes), FNB mot., exh. 9 at 3]. Silkes concludes,

In sum, the individual proposing to send a conditional wire, if he or she claims expertise in this subject area, would know that an MT–100 is not appropriate to protect the funds or, alternatively, would know how to condition it by using Field 72 to make it work as a conditional transfer. Any banker familiar with S.W.I.F.T. wire procedures should likewise know that his was not the optimal or preferred method for facilitating the conditional transfer of funds. However, [FNB] should also have ascertained from the word "Conditional" in the instructions that something other than an unconditional wire was contemplated by the sender and [FNB] should have raised and discussed this issue.

[Pl's expert rpt. (Silkes), FNB mot., exh. 9 at 3]. Thus, both FNB's and Piedmont's experts concur that, if FNB was fully apprized of Piedmont's desire for a conditional funds transfer, banking personnel should have instructed Rivlin that S.W.I.F.T. was not the appropriate means for accomplishing that objective, or it should fashioned the S.W.I.F.T. in such a way to send the funds conditionally. Whether FNB was fully apprized of Piedmont's desired funds transfer conditions and whether banking personnel represented to Rivlin that his objectives would be accomplished by means of attaching the two-page instructions is a disputed issue of material fact.

## 2. Contributory Negligence

 FNB argues that even if FNB were negligent, Piedmont has no claim against it because Piedmont and four of its agents were contributorily negligent. [FNB mot. at 36]. Contributory negligence is a defense—a complete bar to recovery—in the

District of Columbia "when a party knows or by the exercise of ordinary care should have known a particular fact or circumstance and should have acted upon the fact or circumstance with reasonable care for his own safety." *Weil v. Seltzer,* 873 F.2d 1453, 1457 (D.C.Cir.1989)(citing *Queen v. WMATA,* 842 F.2d 476, 478 (D.C.Cir.1988)); *Andrews v. Wilkins,* 934 F.2d 1267, 1272 (D.C.Cir.1991); *see also Wingfield v. Peoples Drug Store, Inc.,* 379 A.2d 685, 687 (D.C.1977)(citing *Karma Constr. Co., Inc. v. King,* 296 A.2d 604, 605 (D.C.1972))("[T]he District of Columbia does not recognize different degrees of contributory negligence. The rule is simply that contributory negligence bars a plaintiff's recovery.")

▆▆▆ Piedmont and its agents have been contributorily negligence if their conduct was unreasonable, i.e., " 'fall[ing] below the standard to which a plaintiff should conform for [its] own protection' ", and Piedmont's and its agents' unreasonable conduct contributed to the plaintiff's injury. *Scoggins,* 419 A.2d at 1004 (quoting RESTATEMENT (SECOND) OF TORTS § 463). The standard is objective; " '[t]he plaintiff is required to conform to the same objective standard of conduct, that of the reasonable person of ordinary prudence under like circumstances' ". *Stager v. Schneider,* 494 A.2d 1307, 1311 (D.C.1985)(quoting W. PROSSER & W. KEETON, THE LAW OF TORTS § 65 at 453 (5th ed.1984)). The jury must decide whether the conduct of Rivlin and Piedmont (and Reigel, if he is brought into the action) was that of a reasonable person of ordinary prudence under like circumstances, which depends on " 'the dangerousness of the activity involved. The greater the danger, the greater the care which must be exercised.' " *District of Columbia v. Mitchell,* 533 A.2d 629, 639 (D.C.1987)(quoting *D.C. Transit System, Inc. v. Carney,* 254 A.2d 402, 403 (D.C.1969)). Piedmont and its agents were " 'not bound to anticipate negligent conduct on the part of others,' " but instead reasonably could assume that FNB would fulfill its duties. *Stag-*

*er,* 494 A.2d at 1311 (quoting J. DOOLEY, MODERN TORT LAW § 4.18 at 115 & n. 1 (1982)).

The instant action presents no unique factual situation that would lead the Court to depart from the general rule that contributory negligence is a question of fact for the jury. *Wilkins,* 934 F.2d at 1272. FNB argues, however, that the question has been removed from the jury by the judicial admissions of the plaintiff and its agents.

▆▆▆ "[T]o constitute judicial admission, [a] statement must be 'by intention an act of waiver relating to the opponent's proof of the fact, and not merely a statement of assertion or concession made for some independent purpose' ". *McNamara v. Miller,* 269 F.2d 511, 515 (D.C.Cir.1959)(quoted in *Johnson v. District of Columbia Rental Housing Comm'n,* 642 A.2d 135, 137 (D.C. 1994)). Pleadings are "not...construed as a judicial admission against an alternative or hypothetical pleading in the same case." *Schott Motorcycle Supply, Inc. v. American Honda Motor Co.,* 976 F.2d 58, 61 (1st Cir.1992)(citing, e.g., FED. R. CIV. P. 8(e)(2) [9] (allowing alternative and hypothetical pleading)), and 5 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1282 at 525 (2d ed.1990)("generally an alternative claim is drafted in the form of 'either-or' and a hypothetical claim is in the form of ' "if-then" ' ").

With respect to McNeal's admission to the alleged obligation and failure to investigate the various players in what appears to have been a prime bank instrument scam, the Court could conclude McNeal was contributorily negligent for the purposes of summary judgment only if it disregarded his sworn testimony where the he speaks to his belief that the funds would be protected by the bank guarantee. [*See* McNeal depo., 47:8–21; 48:4–20; 59:8–21; 62:15–63:10; 63:23–64:8]. The Court declines to do so. Whether McNeal's belief that the funds were protected was reasonable under the circum-

---

**9.** FED. R. CIV. P. 8(e)(2) provides in pertinent part: "A party may set forth two or more statements of a claim or defense alternatively or hypothetically, either in one count or defense or in separate counts or defenses...A party may also state as many separate claims or defenses as the party has regardless of consistency and whether based on legal, equitable...grounds. All statements shall be made subject to the obligations set forth in Rule 11."

stances is genuine issue of material fact for the jury.

The same holds true with regard to Reigel's alleged contributorily negligent actions. FNB makes reference to the "proposed amended complaint" as serving as Piedmont's concession that Reigel was contributorily negligent. Presumably, the proposed complaint is the one that would have added Reigel as a party to the action as FNB's paragraph citations do not correspond to the First Amendment Complaint. That motion was denied with respect to Reigel on March 14, 1997, thus the complaint is not before the Court. Given Reigel's deposition testimony and the disputed material facts surrounding FNB's and Rivlin's transaction, the Court must leave a determination of whether Reigel was contributorily negligent to the jury.

Regarding the contributorily negligent actions of Jones [FNB mot. at 40–41], the actions of Jones (pursuant to the power of attorney granted by Piedmont) in authorizing the release of the funds from the Midland Bank in England took place after FNB's involvement in this case. Thus, his actions are only relevant to whether FNB's actions, if it is found to have been negligent or to have breached the "Application and Agreement" contract, were the proximate cause of Piedmont's loss of $1.5 million, or whether Jones was an intervening cause. The jury must also determine if Reigel, on behalf of Piedmont, was contributorily negligent under the circumstances when it gave the power of attorney to Jones, or whether Piedmont reasonably believed the funds were protected by the purported conditional funds transfer by FNB.

Finally, the Court need not repeat what has been discussed in detail throughout this memorandum opinion regarding the alleged contributory negligence on the part Rivlin. Whether he failed to act with the prudence demanded of a reasonable attorney under like circumstances is a question of fact for the jury. Again, the Court is mindful that Piedmont's expert says that Rivlin was negligent. Rivlin's opposition, however, provides expert testimony that he was not negligent [Rivlin opp., exh. D], thus it remains a disputed issue. Further, the Court is not satisfied that Piedmont concedes the contributory negligence of Rivlin. Piedmont has brought alternative claims against Rivlin and FNB, and the Court will not treat the complaint as conceding Rivlin's negligence. *See United States of Am. v. Insurance Co. of North Am.*, 83 F.3d 1507, 1510 n. 6 (D.C.Cir.1996)("Judicial admissions, however, must be deliberate, express and unequivocal....and are limited to questions of fact." (citations omitted)). Although questions of fact, the Court concludes that the alleged judicial admissions are not unequivocal and are permissible pursuant to FED. R. CIV. P. 8(e)(2).

If the jury finds that negligent actions of Piedmont and its agents to have contributed to Piedmont's injury, only then will FNB be relieved of its responsibility, if any.

### 3. Last Clear Chance

██ Piedmont, in its opposition to the motion for summary judgment, claims that "even assuming, *arguendo*, that Piedmont can be deemed contributorily negligent as a result of the negligent acts of its agents, the doctrine of contributory negligence may still be inapplicable under the Doctrine of Last Clear Chance." [Pl's opp. at 48].

██ The Court is not relying on this doctrine in finding that FNB is not entitled to summary judgment as a matter of law. Nevertheless, it must be pointed out that "[u]nder District of Columbia law, a plaintiff may make out a claim for negligence under the 'last clear chance' doctrine by alleging (1) that plaintiff was in a position of danger caused by negligence of both plaintiff and defendant; (2) that the plaintiff was oblivious of the danger or unable to extricate himself from the position of danger; (3) that defendant was aware, or by the exercise of reasonable care should have been aware of the plaintiff's danger and obliviousness or inability to extricate himself from the danger; and (4) the defendant with means available to him was by the exercise of reasonable care able to avoid [harming] plaintiff after he became aware of the latter's danger and inability to extricate himself from danger, and failed to do so." *Andrews*, 934 F.2d at 1272 (citing *Queen*, 842 F.2d at 481, quoting *WMATA v.*

*Jones,* 443 A.2d 45, 51 (D.C.1982)). The last clear chance doctrine trumps contributory negligence when a defendant who is aware of or should have reasonably been aware of a danger to a plaintiff and of the plaintiff's inability to remove itself from the danger, yet the defendant does not exercise the means it has available to avoid injury to the plaintiff. *WMATA v. Johnson,* 699 A.2d 404, 407 (D.C.1997).

FNB argues that the doctrine is inapplicable here because any danger in which the plaintiff may have been was its, and only its, own fault, thus it fails to meet the first test of the doctrine. Based on FNB's expert testimony, the Court is not convinced that this doctrine would be inapplicable here, but again it would require a jury determination. As noted *supra* at 55, FNB experts pointed out that the transaction information bore all the indicia of a prime bank instrument scam that should have been easily recognized to those in the banking community, and that retail banking personnel are trained to assist customers in filling out the pre-designed forms and in identifying needed codes. Thus, if a reasonable jury could concludes that FNB was fully apprized of the Piedmont's desire to send the money conditionally and that FNB failed to meet the reasonable standard of care expected of a legitimate banking institution in its position (including recognizing the "easily recognized" fraudulent nature of the transaction), it could conclude that FNB, whose wire room made the final determination of the wire language pursuant to the paragraph no. 5 of the pre-designed "Application and Agreement", had the means available to protect Piedmont. *See Johnson v. WMATA,* 901 F.Supp. 1, 3 (D.D.C.1995)(comparing D.C. Circuit opinions)("[P]roof of defendant's responsibility in placing plaintiff in a position of danger is required in order for the last clear chance issue even to arise."). It would include a finding by the jury that Piedmont and its agents, Rivlin, Reigel and McNeal, fully believed they had protected their interests with the conditional wire transfer, and the FNB personnel, Lee and/or Holt, represented to Rivlin that the type of conditional wire Piedmont desired could be achieved by the S.W.I.F.T. funds transfer. Based on the conflicting testimony before the Court, a reasonable jury could make a finding that such representations by FNB were as early as December 15, 1995, prior to the $3 million arriving at the bank, thus the Court cannot conclude for that the last clear chance doctrine is inapplicable here.

### 4. Assumption of Risk

FNB also argues that Piedmont assumed the risk that its funds would be taken by the fraudsters. Again, it is the jury who shall determine "whether the defendant has presented evidence that the plaintiff's behavior in encountering the risk departed from the standard of care that is to be expected of the reasonable person in the plaintiff's position." *Sinai v. Polinger Co.,* 498 A.2d 520, 524 (D.C.1985). District of Columbia law precludes Piedmont from recovering for the negligence of FNB if a reasonable jury concludes that the plaintiff assumed the "risk created by the defendant's breach of duty", thus waiving its claims and consenting to the risk. *Id.* at 524; *accord Mitchell,* 533 A.2d at 639 (quoting *Scoggins,* 419 A.2d at 1004, citing RESTATEMENT (SECOND) OF TORTS § 496E, comment a (1965)).

While contributory negligence is an objective inquiry, assumption of risk is a subjective inquiry—whether the plaintiff actually knew the risk involved. *Seltzer,* 873 F.2d at 1458. And although the doctrines of contributory negligence and assumption of risk overlap, " '[a] clear distinction should be made between the doctrine of contributory negligence which operates as a defense when a party knows or by the exercise of ordinary care should have known a particular fact or circumstance, and assumption of risk, which operates only when the party actually knows the full scope and magnitude of the danger and thereafter voluntarily exposes himself to it.' " *Stager,* 494 A.2d at 1311 (quoting *Sierra Pacific Power Co. v. Anderson,* 77 Nev. 68, 358 P.2d 892, 894 (1961)); *Sinai,* 498 A.2d at 524 (D.C.1985)(citing RESTATEMENT (SECOND) OF TORTS § 496D, "[T]he plaintiff must subjectively know of the existence of the risk and appreciate its unreasonable character."). The key to the assumption of risk is the *voluntariness* of the plaintiff's exposure to

the known risk. *Mitchell*, 533 A.2d at 639. If Piedmont "proceed[ed] in [the] face of a known danger, the plaintiff is regarded as having consciously relieved the defendant of any duty which he otherwise owed the plaintiff. Being under no duty, the defendant may not be charged with negligence." *Sinai*, 498 A.2d at 524.

A hybrid to assumption of risk is identified in the RESTATEMENT, which arises when the theories of assumption of risk and contributorily negligence overlap. Under the hybrid, " 'recovery is barred because of the plaintiff's departure from the standard of reasonable conduct and notwithstanding the misconduct of the defendant.' " *Sinai*, 498 A.2d at 526 (quoting *Pritchard v. Liggett & Myers Tobacco Co.*, 350 F.2d 479, 484 (3d Cir.1965)).

FNB argues the Piedmont's assumption of the risk of losing the $3 million by putting it in the hands of complete strangers is contributory negligent, and thus bars recovery. Although Piedmont voluntarily entered into the transaction, there is sufficient testimony about the caution Piedmont, through its agents Reigel and Rivlin, believed it was taking to prevent the award of summary judgment. Again, without making credibility judgments, the Court cannot ignore the testimony of McNeal, Reigel and Rivlin, all of whom explain time and again that they believed they were protecting the funds by opening the escrow account and sending the conditional wire. For example, Reigel testified, "Keep in mind that we weren't sure this process would work under this contract. That's why we established the trust agreement, trust account/Rivlin relationship, to ensure that we wouldn't fall prey to anybody under this scenario." [Reigel depo., 127:6–10]. And McNeal testified that Piedmont, after looking at about a dozen other deals and deciding against them before entering into the joint venture in dispute. [McNeal depo, 35:5–13], elected against the other deals because it was "unwilling to place our - knowingly place our capital at risk. And that's where they all fell through." [McNeal depo., 35:23–36:5].

With respect to ordinary assumption of risk, only a jury can conclude that the Pied-

mont or its agents knew or should have known FNB was unconditionally transferring the funds and thus assumed the concomitant risk. Thus, the Court cannot conclude as a matter of law that Piedmont assumed the risk of the scam, and waived it right to recoup the loss from FNB.

### 5. Proximate Cause

As with the breach of contract count, FNB argues that any negligence on the part of the defendant was not the proximate cause of Piedmont's injuries. The District of Columbia Court of Appeals defined "proximate cause as 'that cause which, in natural and continual sequence, unbroken by any efficient intervening cause, produces the injury and without which the result would not have occurred.' " *St. Paul Fire & Marine Ins. Co. v. James G. Davis Constr. Corp.*, 350 A.2d 751, 752 (D.C.1976)(quoting *Wagshal v. District of Columbia*, 216 A.2d 172, 175 (D.C. 1966)). "If the danger of an intervening negligent or criminal act should have reasonably been anticipated and protected against, the defendant will be held responsible for the damages which result despite the entry of another act in the chain of causation." *St. Paul Fire & Marine Ins. Co.*, 350 A.2d at 752 (quoted in *Weil*, 873 F.2d at 1459 (refusing to submit the question of intervening cause to the jury)).

As the Court explained *supra* at 53–54, the question of proximate cause is a question of fact for the jury.

### 6. Gross Negligence

As noted *supra* note 1, FNB has failed to directly address the gross negligence count. FNB proceeded solely on the ground that it was entitled to summary judgment as a matter of law on the negligent count, thus it reasonably follows that it would be entitled to summary judgment on the gross negligence count.

"[T]o be gross", negligence "should shock fair-minded men." *Krueger v. Taylor*, 37 F.Supp. 412, 413 (D.D.C.1941)(discussing jury instructions prior to setting aside jury verdict) *affirmed* 132 F.2d 736 (D.C.Cir. 1942). With the number of disputed issues of material fact swirling around the FNB wire transfer coupled with FNB's failure to

specifically plead its entitlement of summary judgment on the gross negligence count, the Court cannot conclude as a matter of law that FNB did not commit gross negligence when it transferred the $3 million to the Midland Bank unconditionally.

## V. CONCLUSION

After considering the defendant First National Bank of Maryland's motion for summary judgment, the oppositions, the reply, the entire record, and the applicable law, viewing all facts and inferences in a light most favorable to Piedmont, the non-moving party, the Court concludes that First National Bank of Maryland is not entitled to summary judgment as a matter of law, thus its motion shall be denied.